UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| HEIDI E. SCHROEDER,<br>    Plaintiff, | : | CIVIL ACTION NO.<br>3:03CV 0410 (MRK) |
| VS. | : | |
| ACMI CORPORATION,<br>    Defendant. | : | OCTOBER 18, 2004 |

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO PRECLUDE TESTIMONY OF PLAINTIFF'S EXPERT ALAN FALKOFF, M.D. AND TO CONDUCT A FED. R. EVID. 104(a) HEARING**

The defendant, ACMI Corporation ("ACMI"), moves for an order precluding the plaintiff, Heidi Schroeder, from utilizing the testimony and documents of Alan T. Falkoff, M.D. ("Falkoff") at the trial of this matter. The plaintiff cannot meet the standards for admissibility of expert testimony enunciated in Fed. R. Evid. 702 and <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579, 113 S.Ct. 2786 (1993) and <u>Kumho Tire Co. v. Carmichael, et al</u>, 526 U.S. 137, 119 S.Ct. 1167 (1999). As such, many of Falkoff's opinions are inadmissible, and the Court should issue an order precluding their use at trial.

**I.   LAW AND ARGUMENT**

The plaintiff has proffered Falkoff as an expert witness in this case and has provided the opinion attached hereto as Exhibit A. In Exhibit A and during his deposition in this matter, Falkoff has rendered opinions purporting to relate to the diagnosis, characteristics, prognosis and cause of the plaintiff's psychiatric condition. In Exhibit A, Falkoff has also opined that ACMI mistreated the plaintiff and violated the law in so doing. For the foregoing reasons, Falkoff's testimony should be excluded.

One Goodwin Square
225 Asylum Street
Hartford, CT 06103

**HALLORAN & SAGE LLP**

Phone (860) 522-6103
Fax (860) 548-0006
Juris No. 26105

A.  **Daubert & Kumho Establish the Standard for Admissibility of Dr. Falkoff's Proffered Expert Testimony.**

The admissibility of expert testimony is controlled by Fed. R. Evid. 702 and the U.S. Supreme Court cases of Daubert and Kumho Tire. Rule 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

In Daubert, the U.S. Supreme Court held that Rule 702, not the "General Acceptance" test analysis in Frye v. United States, 293 F. 1013 (D.C. 1923), controls the admissibility of expert testimony in federal trials. Daubert, 509 U.S. at 587-89. The court in Daubert charged the trial judge to act as the "gatekeeper" and under Fed. R. Evid. 104(a) in order to determine if "the expert is proposing to testify to scientific knowledge that will assist the trier of fact to understand or determine a fact in issue." Daubert, 509 U.S at 592.

B.  **The Opinion of Falkoff that ACMI Mistreated Plaintiff Is an Ultimate Issue of Fact for the Jury, and He Is Not Qualified to Opine on Such Matters.**

Falkoff has given an opinion that is inadmissible because it invades the province of the trier of fact. He has opined that ACMI and/or its employees acted improperly and/or violated the law in its treatment of the plaintiff. (See Exhibit A, pp. 671-673.) The conclusions that Falkoff makes in this regard are material issues which the jury needs to determine in order to find that ACMI's actions violated the law.

- 2 -

The Second Circuit has reviewed the issue of an expert witness expressing a legal conclusion in Hygh v. Jacobs, 961 F2d 359, 364 (2d Cir. 1992), and has aligned itself "with other circuits in requiring the exclusion of expert testimony that expresses a legal conclusion." Id. at 363. In Hygh, the Second Circuit held that "an expert's testimony that a defendant was 'negligent' should not have been allowed." Id. at 364. Federal Rules of Evidence 704(a) states that "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." However, the advisory notes state in part that "ultimate opinion testimony that merely tells the jury what result to reach is not regarded as helpful." Moreover, Rule 702 states that an expert opinion must "assist the trier of fact to understand the evidence or to determine a fact at issue."

Here, Falkoff is not an expert on how employers are required to treat their employees. He has not claimed otherwise. Yet, he has opined, *inter alia*, that ACMI's actions were a "blatant violation of the American's with Civil Disabilities Act." (Exhibit A, p. 672.) He has also opined that the plaintiff was "harassed" and "terrorized" at work. (Exhibit A., p. 672.) Falkoff admits that he has no first hand knowledge of the plaintiff's treatment at ACMI, but has based his conclusions solely upon the information supplied to him by the plaintiff. (Deposition of Falkoff, March 4, 2004, pp. 110-11 [hereinafter "Falkoff Dep., p. ___."], attached at Exhibit B.) Because Falkoff is not an expert on the treatment that employers must afford to employees, and his testimony will not be helpful to the jury in this regard, and because he has stated legal conclusions in his opinions, this testimony should be excluded.

One Goodwin Square
225 Asylum Street
Hartford, CT 06103

HALLORAN
& SAGE LLP

Phone (860) 522-6103
Fax (860) 548-0006
Juris No. 26105

### III. CONCLUSION

Based upon the foregoing, ACMI requests that this Court hold a <u>Daubert</u> hearing to determine the admissibility of plaintiffs' expert witness, Falkoff, and after that hearing, enter an order excluding his testimony for the reasons set forth herein.

```
                                THE DEFENDANT:
                                ACMI CORPORATION


                                By_____
                                   James M. Sconzo
                                   Fed Bar # ct04571 and
                                   Jonathan C. Sterling
                                   Fed Bar # ct24576 of
                                   HALLORAN & SAGE LLP
                                   One Goodwin Square
                                   225 Asylum Street
                                   Hartford, CT 06103
                                   (860) 522-6103
```

### CERTIFICATION

This is to certify that on this 18th day of October, 2004, I hereby mailed a copy of the foregoing to:

Kathryn Emmett, Esq.
Christine Caulfield, Esq.
Emmett & Glander
45 Franklin Street
Stamford, CT 06901

```
                                _____
                                Jonathan C. Sterling
```

603949

— 4 —



# HIGH RIDGE FAMILY PRACTICE

Alan T. Falkoff, M.D., D.A.B.F.P.
Joshua B. Herbert, M.D., D.A.B.F.P.

992 HIGH RIDGE ROAD
STAMFORD, CONNECTICUT 06905
TELEPHONE: (203) 322-7070
FAX: (203) 322-2389

January 16, 2004

To Whom It May Concern:

I am writing this narrative letter at the request of Kathryn Emmett, Esq. under the authorization of Ms. Heidi Schroeder. This written report will address the items requested in you're the letter of request to me dated December 29, 2003. The patient's authorization to release this information was obtained by Emmett & Glander on 1/7/04. Emmett & Glander have a copy of the patient's medical records. This narrative is a supplement to those medical records and an explanation of the patient's ongoing issues. The patient is presently a 44 year old white, single female.

Ms. Heidi Schroeder has been a patient of High Ridge Family Practice since 9/28/99. Her first office visit was for a follow-up to her hospitalization for pneumonia. It was noted in subsequent visits of 12/2/99 & 1/6/00 that the patient was suffering from Anxiety and Panic Disorder. She commented that other people were commenting on her mood, that she cried easily, was having difficulty sleeping and did not find anything in her life pleasurable. During this period her mother, who the patient was living with, became severely ill and subsequently died. She noted her anxiety symptoms and her problems sleeping worsened and stated this at her 4/6/00 office visit. She now as clinically depressed as well has suffering from anxiety and panic disorder. At this time she was taking Xanax 0.25mg once daily prn (as needed), Paxil 20mg qd (once daily) and Sonata 10mg qd hs (bedtime) prn. Additionally, with her increased stressors her BP was noted to be elevated to 150/100 and she was also begun on Tiazac 180mg one qd for her blood pressure. As she returned to reassess her symptoms and her BP at a follow-up office visit on 5/4/00 she noted she was feeling much better and coping with the death of her mother appropriately. Her BP was still elevated, though improved and therefore her Tiazac dose was appropriately increased to 240mg one qd.

The patient was then seen on a usual maintenance medical routine for BP control. She expressed some concern about her weight and was interested in trying to improve her overall health. She had lost 10# over the prior 4 months and overall stated she was feeling much better. Work was done with the patient to begin to identify her Health risk factors and assist her with future health care plans. This was 6/30/00 and 8/24/00. During this time she noted some increase anxiety periodically due to increased "stress at work". During the 6/30/00 office visit she cited some "trouble with specific co-workers".

Ms. Schroeder continued to work on her health care issues with her smoking, HTN, elevated lipids and NIDDM (non-insulin dependent Diabetes mellitus) all being addressed as her risk factors. She was feeling better, taking her medications, getting some exercise and improving her diet. She had lost an additional 7# by this office visit on 10/19/00. She was begun on Lipitor for her elevated Lipids. Her BP control was very good and her mood and sleep problems were markedly improved with her medications and were continued.

At her 12/19/00 office visit the patient noted that she worked for Circon, building medical instruments. She noted that she was having more anxiety lately and that she had some increased stress since her mother's death on 2/4/00. She remained medically stable at this time regarding her BP, Lipids, Glucose control and had made excellent progress with her diet reducing her weight further by 15.5# from her prior office visit through better diet, exercise and medical compliance. She had successfully reduced her weight from 214# to 180.5#, 33.5# since she arrived at the practice. Her weight loss was due to her diligence and medical care and follow-up. She was making generally good progress.

Then in 1/17/01 things began to unravel for Ms. Schroeder. She cited continued "harassment and a lot of stress at work". She denied drug use, EtOH (alcohol) use. She was taking her medications, continuing to exercise and follow her diet and had brought her weight down to 176#. Minor issues of plantar warts and other minor skin lesions were addressed at subsequent office visits between 1/17/01 and 2/15/01.

On 3/5/01 Ms. Schroeder arrived to state that she had very severe anxiety and panic attacks just a few days prior. She felt some of her symptoms were attributable to her "working too hard, working considerable overtime". Again a few subsequent office visits followed for minor skin processes.

The office visit of 6/22/01 was marked by the patient noting a marked increase in panic attacks, anxiety attacks and depression. She stated that when she tried to increase her dose of Paxil in the past it met with her having symptoms she stated as paranoia. She noted that on rare occasions she heard voices. She had never seen a psychiatrist in the past. Her medications were adjusted and she was started on Klonopin and discussions began regarding having the patient see a psychiatrist for her symptoms and prolonged grieving. Her symptoms appeared to worsen over the next month and it was considered that she may have a diagnosis of Bipolar illness, again the issues regarding a Psychiatric consultation were held. She felt however, that she was doing well in general and did not want to change her medications further or seek additional help yet.

She continued her routine of follow-up office visits. Discussions with the patient noted she worked the 3 PM to 11 PM shift at her job. At the office visit of 8/24/01 she accepted a referral to a Psychiatrist, Dr. Carl Mueller.

670

Follow-up office visit of 9/17/01 the patient noted continued episodes of anxiety attacks. These responded to Xanax. But she noted her symptoms also occurred following the World Trade Center attack on 9/11/01, though she felt this did not trigger her symptoms.

Shortly thereafter, Ms. Schroeder began seeing Dr. Mueller and her medications were being adjusted. She was continuing to be followed medically in the office on a regular basis. She finally, after nearly 2 years agreed to a medical physical exam which was done on 11/30/01. At that time additional information was obtained from the patient. She was a High School Graduate of Rippowam HS in Stamford, Ct. She worked as a Medical Tech for Circon ACMI for a number of years doing work building medical instruments on the 3 PM to 11 PM shift. Her BP, Wt had remained stable and well controlled, she was maintaining her weight at about 181#. Dr. Mueller was seeing her consistently and she was having her medications adjusted and her diagnosis per Dr. Mueller at that time was Generalized Anxiety Disorder w/Panic Attacks and Depression.

On 1/28/02 the patient came to the office for a follow-up visit and was markedly in poor shape. She had regained weight to 214#. Her BP however remained well controlled. She stated she was very depressed and was having a great deal of difficulty functioning, just spending "a lot of time in bed". She noted that she was placed out on disability by Dr. Mueller since 12/7/01. She noted this followed some significant problems at work. All this information was well documented in her notes of her office visit for 1/28/02. She noted that "she was made to work with and be trained by an individual at work that she claims had tried to terrorize her in the parking lot at work and on the road". She noted that "this was reported to her superiors at work as well as the police". From this point forward some time probably in 12/2001 the patient's life had taken a drastic downturn. She was frightened to go to work. She had no energy, no motivation and just felt she could not do anything.

The patient came in for subsequent office visits for her routine medical care and on a visit on 4/26/02 she noted that she was being harassed even more from work. She was very upset over "how she had been treated at work after being such a conscientious and highly rated worker for so many years". She was very upset and feeling harassed as her work, company, stopped her disability checks in February 2002. At this time I made notations in my assessment and plans for Ms. Schroeder that and I quote from my notes of 4/26/02, that "from the patient history of events at work it would appear that the patient had experienced overt harassment, possibly in an attempt to have her leave her job and force her out. Now being harassed even more by not sender her the disability checks she is owed. This is clearly abuse and taking advantage of the mentally ill".

671

As a comment here, it should have been clearly evident during this period from 9/28/99 through 4/26/02 that this patient had an underlying mental illness. She however demonstrated high functioning as evidenced by her long standing employment history. However, she was made a target of harassment by her reports which in and of itself is a severe violation of the patient's civil rights for a person without a mental illness. But for a person who was evidently, and could be easily seen by any supervisor or co-worker, as being somewhat mentally disabled and incapacitated it is inexcusable that she should suffer such targeted abuse. This is what I would strongly consider a severe abuse of a disabled person and a blatant violation of the American's with Civil Disabilities Act. This would be akin to pushing a person in a wheelchair down a flight of stairs. Since these events at work Ms. Heidi Schroeder has never been the same person. She has suffered considerably in her emotional stability, her confidence to be an independent person and as a reliable worker. I feel that it is unlikely she would ever again be fit to return to any work. Her psychological scars are too deep on what was evidently a very fragile ego. She always and continues to be a very nice person, unassuming and nonaggressive. She has been made to be so devastated by all these events and her abuse at work and her being terrorized that her passive personality may never recover. It is beyond my comprehension that the Supervisors at her employment would place her to work with and be trained by a co-worker they were fully aware was giving Ms. Schroeder a hard time and actually had terrorized her. That co-worker as well as the supervisors and Circon ACMI should be held fully responsible.

From her office visits of 5/10/02 forward, 6/17/02, 8/14/02, 9/18/02, 10/18/02, 11/19/02, 1/17/03, 3/31/03 and onwards to her present office visits she has ruminated on events that have caused her distress. She is frightened and does not feel she can ever return to work because she is often afraid all the time. She continues to fight depression and anxiety. She is being medically monitored for HTN, Elevated Lipids, NIDDM, COPD as well as continuing to get psychological help for Generalized Anxiety Disorder, Panic Disorder and Severe Depression. Her problems at work on top of her compromised medical status has led to this severe decline. During this time her weight had climbed back up to 254#. Her DM, HTN and elevated lipids have been kept in check through the close medical monitoring and medications. A far cry from the progress she was making prior to these events that triggered what is probably a permanent condition. It is unlikely she will ever be the same. I would consider her permanently disabled at 44 years old, and she technically has been disabled since 12/2001, and I am certain Dr. Mueller would agree. These mental disabilities she has suffered has also likely caused a considerable strain on her overall general medical health and has thus probably compromised her and disabled her medically for the rest of her life and may have even shortened her lifespan.

672

If I can be of further assistance, please do not hesitate to contact me. It is sad in this day and age that we have to continue to witness events such as these. Isn't it enough that the world has been haywire for years. Should we permit the abuse of the mentally impaired and disabled such as Ms. Heidi Schroeder. I hope that the courts will find favorably in her case.

Thank you for your time and consideration in this matter.

Sincerely,
Alan T. Falkoff, M.D., D.A.B.F.P
High Ridge Family Practice
Chief of the Department of Family Practice The Stamford Hospital

cc: ATF

673

```
                UNITED STATES DISTRICT COURT
                   DISTRICT OF CONNECTICUT


HEIDI E. SCHROEDER          ) Civil Action No.:
              Plaintiff     ) 3:03CV0410 (MRK)
vs.                         )
ACMI CORPORATION            )
              Defendant     )


        DEPOSITION OF:  DR. ALAN T. FALKOFF, to
be taken before Denise D. Harper-Forde,
Licensed Registered Professional Reporter and
Notary in and for the State of Connecticut,
pursuant to notice, at HIGH RIDGE FAMILY
PRACTICE, 992 High Ridge Road, Stamford,
Connecticut on March 4, 2004.


APPEARANCES

EMMETT & GLANDER
Attorneys for the Plaintiff
45 Franklin Street
Stamford, Connecticut   06901
   (203) 324-7747
   BY:  KATHRYN EMMETT, ESQ.

HALLORAN & SAGE, LLP
Attorneys for the Defendant
One Goodwin Square
225 Asylum Street
Hartford, Connecticut   06103
   (860) 522-6103
   BY:  JONATHAN C. STERLING, ESQ.



          Denise D. Harper-Forde
 Licensed Registered Professional Reporter
          License No.: 00133
          NIZIANKIEWICZ & MILLER
             972 Tolland Street
  East Hartford, Connecticut   06108-1533
             (860) 291-9191
```

NIZIANKIEWICZ & MILLER 

1   parking lot incident, what other allege
2   instances of harassment did Heidi report to
3   you at her employer?
4           A.      The instance of her being told
5   that she was going to be given another
6   position at work.  Being transferred to a
7   different work station or different job
8   situation.
9                   And then having the guy who she
10  reported to the supervisors, and was the one
11  who had been harassing her and had run her --
12  attempted to run her off the road and stuff,
13  got reassigned as her supervisor or mentor to
14  teach her the new job.
15          Q.      Is there anything else that you
16  can think of?
17          A.      The issues regarding the
18  disability checks, and not getting a lot of
19  response from the Company in terms of helping
20  her to alleviate the situation of the
21  disability claims.
22          Q.      Okay.  And do you have -- have
23  you gotten information from anyone else about
24  those allegations?  Has anyone else -- do you
25  have any other information which corroborates

                    NIZIANKIEWICZ & MILLER


1  those allegations, other than what she told
2  you?
3      A.    Susan may have mentioned at that
4  visit that there were issues in terms of Heidi
5  not getting the checks and the money.
6            And that Susan had told me that,
7  you know, Susan would make sure that there was
8  -- she would be able to afford to, you know,
9  buy her food. And you know, get medications
10 if needed and things along those lines; yes.
11           If Heidi would let her help her.
12 You know, that kind of situation. But more
13 than that, I don't think there was any
14 additional information. I mean, Susan was
15 aware of the issues, because Heidi had
16 reported these events to Susan.
17     Q.    And Susan got her information
18 from Heidi as well?
19     A.    And Susan got her information
20 from Heidi. I don't know whether or not Susan
21 had gone to follow-up and intervened at work
22 or anything else. I am not aware of any of
23 that information.
24           MR. STERLING: Note of
25     10-18-02. Bates stamped 686.
         NIZIANKIEWICZ & MILLER