# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| HEIDI E. SCHROEDER, | : | CIVIL ACTION NO. |
|     Plaintiff, | : | 3:03 CV 0410 (MRK) |
|  | : |  |
| v. | : |  |
|  | : |  |
| ACMI CORPORATION, | : |  |
|     Defendant. | : | JANUARY 21, 2005 |

## PLAINTIFF'S LOCAL RULE 56(a)(2) STATEMENT

Pursuant to Local Rule 56(a)(2), plaintiff Heidi Schroeder, through counsel, respectfully submits this statement of material disputed facts in response to defendant's Local Rule 56(a)(1) statement dated October 18, 2004.[1]

    1.      Plaintiff does not dispute the facts set forth in Paragraph 1.

    2.      Plaintiff does not dispute the facts set forth in Paragraph 2, but states that she was assigned to work on the first shift for approximately one month at the commencement of her employment for training.  See Ex. 20.

    3.      Plaintiff does not dispute the facts set forth in Paragraph 3.

---

[1]    All exhibits referenced herein are attached to the Affidavit of Attorney Kathryn Emmett in Support of Plaintiff's Opposition to Summary Judgment dated January 21, 2005.

4.      Plaintiff does not dispute that certain aspects of her employment relationship with ACMI, formerly Circon Corporation, were governed by the Collective Bargaining Agreement [CBA], as set forth therein, and refers to the CBA, attached to defendant's Memorandum of Law in Support of Summary Judgment as Exhibit B.  Plaintiff disputes any suggestion, however, that the CBA applies to the issues involved in this case and refers to her Memorandum in Opposition to Summary Judgment [hereinafter Memorandum] at Section III.C.2.

5.      Plaintiff does not dispute the facts set forth in Paragraph 5.

6.      Plaintiff does not dispute the facts set forth in Paragraph 6.

7.      Plaintiff does not dispute that she was assigned to first shift in October 1998 for training.  See Ex. 20.

8.      Plaintiff does not dispute the facts set forth in Paragraph 8.

9.      Plaintiff does not dispute the facts set forth in Paragraph 9.

10.     Plaintiff disputes that she was "heavily dependent on her mother emotionally and domestically" and states that the deposition testimony cited by defendant does not support that allegation.  Plaintiff did live with her mother for most of her life and did have a close relationship with her mother.  See Ex. 1 (Schroeder) at 25-26; Ex. 13 (S. Schroeder, plaintiff's sister) at 29-31.

2

11.    Plaintiff does not dispute that following her mother's death she "appeared to become saddened," and states that she was diagnosed as suffering from depression at that time. See Exs. 17 and 18. See also Ex. 9 (Ranita) at 80-81 (plaintiff appeared devastated following her mother's death), 133-34.

12-15.    Plaintiff does not dispute the facts set forth in Paragraphs 12 and 13, but disputes defendant's characterization of the events and refers to her deposition testimony concerning what transpired, including that Peggy Amalfi interrupted a conversation plaintiff was having with Fred King and laughed and whispered in his ear under circumstances that clearly suggested she was making a comment about plaintiff, that Aida Diez told Amalfi to "leave [plaintiff] alone," that plaintiff became very upset that her coworkers were taunting her again and that management was not taking any action to correct the situation, that plaintiff began suffering a panic attack and needed to leave the building, that she attempted to contact Scaglia at his extension and over the PA system, but was unable to reach him and left him a voice mail instead, and that Scaglia saw plaintiff crying as she was leaving, but nonetheless "counseled" her for leaving the building without permission. See Ex. 1 (Schroeder) at 62-65. See also Ex. 22. Plaintiff disputes defendant's statement in Paragraph 14 that she did not notify any superior that she was leaving the ACMI building, as set forth above. See also Ex. 13 (S. Schroeder) (". . . she

3

called me hysterical on the way home. And I think she had left John Scaglia a voice mail message and maybe even have seen him as she drove away at the door, that he later reprimanded her for not getting permission to leave first."); Ex. 11 (Scaglia) at 73. Plaintiff does not dispute defendant's statement in Paragraph 15 that she was "warned that similar acts in the future would result in more severe disciplinary action" and refers to Exhibit 22.

16-17.     Plaintiff does not dispute that King complained to Scaglia that plaintiff had used his work bench while he was out and that both she and King were "counseled" by Scaglia as a result, but states further that she had done nothing wrong in using King's bench and that Scaglia failed to check to see whether plaintiff had, in fact, left the work bench messy, as King claimed, or whether King was making unfounded complaints against plaintiff. See Ex. 1 (Schroeder) at 68; Ex. 11 (Scaglia) at 74; Ex. 22. Plaintiff disputes that she and King were cited "for being discourteous." Ex. 23.

18.     Plaintiff does not dispute the facts set forth in Paragraph 18.

19.     Plaintiff does not dispute that Scaglia testified at deposition, as cited by defendant in support of Paragraph 19, that other employees "were involved," but states that she has no knowledge concerning whether other employees were, in fact, given similar warnings.

20-21.     Plaintiff does not dispute that the incident described in Paragraph 20

4

occurred, but once again disputes defendant's characterization of the incident and refers to her deposition testimony concerning what transpired, including that Fred King became angry at plaintiff when she objected to his throwing balled up paper on her clean work area, glared at plaintiff in an intimidating manner as she was leaving work that night after the shift ended just before midnight, and, as she was driving home, tailgated plaintiff's car in a frightening manner, accelerating up to the back end of her car and then pulling inches away from the driver's side of her car at a light. See Ex. 1 (Schroeder) at 82-87; Ex. 9 (Ranita) at 93-97. See also Ex. 13 (S. Schroeder) at 86. Plaintiff disputes defendant's suggestion in Paragraph 20 that she claims that the incident definitely occurred in March or April 2001, but does not dispute that the incident occurred in the spring or early summer of 2001 and prior to Dan Hill beginning as Production Supervisor on the second shift on or about May 29, 2001. See Def. Mem., Ex. E (Offer Letter).

22.    Plaintiff does not dispute that ACMI management allowed her to report the incident to a City of Stamford police officer the following day at work during break time. See Ex. 1 (Schroeder) at 88.

23.    Plaintiff does not dispute that the police took a statement from plaintiff at ACMI and spoke with, but did not arrest, King. See Ex. 1 (Schroeder) at 87-88.

24.    Plaintiff disputes defendant's representation that "[n]one of the twelve (12)

5

coworkers and supervisors deposed by the plaintiff testified as to any disability-based harassment, mistreatment or discrimination" and refers to her Memorandum at Sections II and III.B.1.b. and citations to the evidence therein including, but not limited to Exhibit 3 (Gerace) at 15; Exhibit 5 (Hill) at 20-21, 27-29, 39, 42-43; Exhibit 9 (Ranita) at 93-97; Exhibit 11 (Scaglia) at 31-32, 43, 73-74, 88-95, 163-65, 168-70.

25.    Plaintiff disputes the fact set forth in Paragraph 25 and states that the deposition testimony cited by defendant does not support, but rather contradicts, that plaintiff "often acted rudely and inappropriately toward her coworkers." See Ex. 5 (Hill) at 47-8 (testifying that he never observed plaintiff engaging in any abusive behavior toward her coworkers and stating only that: "She was abusive toward me.  Abusive to me is if somebody asks you a polite question and says hello:  Just leave me alone.  That's abusive, that's what I consider abusive, so maybe we should be clear on that, other people might just call it rude.").  Plaintiff states, furthermore, that other than the group of coworkers about whom plaintiff complained, and John Scaglia and Dan Hill, who supervised plaintiff and this group, none of plaintiff's coworkers or other representatives of ACMI management characterized plaintiff in negative terms as moody or difficult.  Others described friendly interactions with plaintiff, but noted that she became

6

depressed after her mother's death and would cry on occasion at work.  See e.g., Ex. 3 (Gerace) at 11-13, 22-23; Ex. 4 (Harris) at 49-51; Ex. 7 (Lupien) at 24-25, 32.

26.    Plaintiff does not dispute that she was friendly with King, Ranita, Amalfi and Diez at one time, but disputes defendant's allegation that plaintiff "later became unfriendly towards them" and states that the deposition testimony cited by defendant, once again, does not support defendant's allegation.  Plaintiff states further that her relationship with her coworkers began to deteriorate after her mother died and her coworkers began to ridicule and antagonize her because they were annoyed by her depressed state and/or knew she was mentally disabled and wanted to get a rise out of her . See Ex. 1 (Schroeder) at 75-76; Ex. 11 (Scaglia) at 31-32 (Amalfi and Diez complained that plaintiff was difficult to get along with, moody and temperamental); 37 (acknowledging that plaintiff's emotional condition worsened after her mother's death).

27.    Plaintiff does not dispute the facts set forth in Paragraph 27 and states that she was required to be given an opportunity to train for the promotion because a position opened and she had seniority in the department.  See Ex. 5 (Hill) at 32-35; Ex. 11 (Scaglia) at 110.

28.    Plaintiff states that the deposition testimony cited by defendant does not support the allegation set forth in Paragraph 28 that "[b]efore one can be promoted to 1st class, that individual is required to master all procedures required for the 2nd class position," but rather only that one must satisfactorily perform one 2nd class procedure called a "412".  See Ex. 5 (Hill) at

7

40; Ex. 12 (Tarca) at 46; Ex. 9 (Ranita) at 118. Plaintiff disputes that employees are always required to "master all procedures required for [a] 2nd class position" before promotion to a 1st Class position. See Ex. 2 (Arotsky) at 14-19 (acknowledging that some employees lack proficiencies that are ordinarily required in their class and discussing Exhibit 33 (marked for ID as Exhibit 2 at deposition) that shows a lack of uniform proficiency within one class and from one class to the next).

29.     Plaintiff does not dispute the facts set forth in Paragraph 29 and refers to her response to Paragraph 28.

30.     Plaintiff does not dispute the facts set forth in Paragraph 30.

31.     Plaintiff does not dispute that she was on the second shift at that time, that King was a qualified trainer on the 412 process, and that she was assigned to be trained by King. Plaintiff disputes that it was established that "she would be working side by side with Mr. King after she became a Medical Instrument Maker, 1st Class." The night shift had only one 1st Class Medical Instrument Maker at the time, Binh Kha. See Ex. 5 (Hill) at 34. Dan Hill testified at deposition that management was considering promoting a total of *two to three* additional 2nd Class Medical Instrument Makers to 1st Class in order to form a night shift line of 1st Class Medical Instrument Makers. See id. at 33, 37. The candidates for promotion, in order of seniority, were plaintiff, Ha Trinh, Chris Ranita and Fred King. See id.; Ex. 11 (Scaglia) at 112, 159; Exs. 24-25. Thus, it should have been possible that plaintiff be promoted to work on a line

8

without King since he was fourth in order of seniority and, according to Hill, management was considering promoting two to three individuals. Plaintiff also disputes the suggestion that these were her supervisors' reasons for assigning her to be trained by King and refers to her Memorandum at Sections II, III.B. and III.C..

32. Plaintiff does not dispute the facts set forth in Paragraph 32, but disputes the suggestion that she *willingly* agreed to be trained by King. Plaintiff reiterated to her supervisors when they informed her about the training assignment that she was afraid of King, but she was told that she would have to be trained by King if she wanted the promotion. See Ex. 1 (Schroeder) at 114-16 ("When they told me I had to train with him, I knew – you know, I think John said look – John or Dan said to me look, if you want to be first class, you're going to have to train with Fred. That's the way it's got to be. . . . And I was scared, but you know that is what they said. That's the way it has to be. So when it came down to it, I was terrified."), 124-25, 128-30; Ex. 24 at 77 (Hill notes). Having been informed that she had no choice if she wanted the promotion, plaintiff agreed to be trained by King. See id. See also Ex. 13 (S. Schroeder) at 60-61.

33. Plaintiff does not dispute that she requested that she not be, and never was, assigned to be trained by Amalfi, but disputes the suggestion that she willingly agreed to be trained by King and refers to her response to Paragraph 32.

34. Plaintiff does not dispute that she stated to Hill that King was behaving like an

"angel" during the training in an effort to get her supervisors to reassign her without making them angry. See Ex. 1 (Schroeder) at 94. Plaintiff states further that, when she began to disintegrate emotionally as a result of being required to be trained by King, she went to the shop steward, Maria Gerace, to request help. See Ex. 13 (S. Schroeder) at 155 ("I think after being told that she had to train with Fred and being so stressed out and worried by that, you know, she just couldn't take it."); Ex. 3 (Gerace) at 15 ("[plaintiff] came to me and told me she was very nervous about being trained with Fred King."). Ms. Gerace then asked Hill and Scaglia to reassign plaintiff to be trained by the group leader, Charlie Harris, but they refused, according to Gerace, "adamant that [plaintiff] needed to get along with her co-workers." Ex. 3 (Gerace) at 15. Only then did plaintiff speak with Hill and state that, even though King was being an "angel," she wanted to be trained by someone else with whom she felt she could learn better in an effort to get her supervisors to reassign them and without making them angry. See Ex. 1 (Schroeder) at 94.

35.    Plaintiff does not dispute that Hill told King and Ranita that he "would not tolerate any bad behavior toward [plaintiff] during her training" and that they "assured [him] they'd behave." Ex. 24.

36-37.    Plaintiff does not dispute the facts set forth in Paragraph 36 and 37, but states that she does not recall specifically how many days she was trained by King before she was unable to continue. Plaintiff states further that, as a result of being denied reasonable accommodations and the hostile work environment to which she was subjected at ACMI

10

including being required to continue to work near and be trained by King, plaintiff had become an emotional wreck, was no longer able to concentrate, and was breaking the medical instruments she was being trained to assemble. See Ex. 11 (Scaglia) at 143-44; Ex. 5 (Hill) at 49-51. See also Ex. 1 (Schroeder) at 113, 120; Ex. 24 at 79 (Scaglia notes). As stated in response to Paragraph 34, plaintiff went to the shop steward, Maria Gerace, to request help, Gerace asked Hill and Scaglia to reassign plaintiff to be trained by a group leader, Charlie Harris, Scaglia and Hill initially refused, and plaintiff herself then spoke with Hill and stated that even though King was being an "angel," she wanted to be trained by someone else with whom she felt she could learn better in an effort to get her supervisors to reassign her without making them angry. Only then did plaintiff's supervisors agree to assign plaintiff to be trained by Nguyen briefly and then by Harris on the day shift. See Ex. 11 (Scaglia) at 143-44; Ex. 5 (Hill) at 49-51. See also Ex. 1 (Schroeder) at 113, 120; Ex. 24 at 79 (Scaglia notes).

38.     Plaintiff does not dispute that Ms. Nguyen was trained by King on the 412. Plaintiff states further, however, that Ms. Nguyen had not, as of the time of her deposition, applied for a 1st Class position, and, therefore, unlike plaintiff, she was not assigned to be trained by King, who was then a 2nd Class Medical Instrument Maker, for promotion to a 1st Class position. Plaintiff does not dispute that Hill testified that plaintiff told him that Nguyen "showed [her] a little bit different way to do [the 412] that work[ed] better for [her]," but states that plaintiff does not recall any specifics about training with Nguyen and that Scaglia testified that

11

plaintiff was only assigned to be trained by Nguyen briefly because both thought she wasn't getting much out of it. See Ex. 1 (Schroeder) at 96-7; Ex. 11 (Scaglia) at 144); Ex. 5 (Hill) at 49.

39-40.    Plaintiff does not dispute the facts set forth in Paragraphs 39 and 40, but states that her reassignment to Harris did not result because of a simple request by plaintiff, as defendant suggests, and refers to her response to Paragraphs 36 through 38.

41.    Plaintiff does not dispute the facts set forth in Paragraph 41, but disputes defendant's suggestion that plaintiff simply decided she didn't want to pursue promotion to 1st Class, refers to her response to Paragraphs 34, 36 and 37, and states further that she told Hill and/or other ACMI management she was no longer able to work under the circumstances. See Ex. 1 (Schroeder) at 99-100 ("I just remember I went to the steward's office, and saying just let me out."); Ex. 5 (Hill) (". . . she came to me and says: I can't do this, I don't want to do it anymore, I want to stop training. . . . I want to go home, I have a headache. I said: Why don't you just take it easy and relax . . . No I have a headache, I want to go home. I let her go home, and she never came back.").

42.    Plaintiff does not dispute that she testified at deposition, as cited by defendant in support of Paragraph 42, that she "had had it" and "went to the shop steward and told that [she] wanted to quit" after being required to be trained by King, and states further that she wanted to leave ACMI as a result of the intolerable work circumstances, as set forth in detail in her Memorandum at Sections II and III.B..

43.    Plaintiff does not dispute that she "left work and went on leave on or about December 7, 2001, and was granted short-term disability benefits thereafter," but disputes that she left voluntarily, refers to her response to Paragraphs 36 and 37, and states that she left work as a result of the intolerable circumstances to which she was subjected at ACMI, having been constructively discharged. See Plaintiff's Memorandum at Section III.B.3. Plaintiff states further that the deposition testimony cited by defendant in support of Paragraph 43 does not support the allegation that she left work voluntarily, but rather contradicts it, and furthermore was not even made in response to a question concerning her reasons for leaving ACMI. See Ex. 1 (Schroeder) at 114-15 ("**Q. You don't think there was an accommodation [that would have allowed you to continue to perform your job]?** A. I didn't want to get trained by Fred King. I was terrified of him. When they told me I had to train with him, when he came back the day after he tried to run me off the road. I remember running upstairs to Human Resources, and John Scaglia was sitting at a desk with some woman. And I told John, Fred is here. And he said so what? Go back to your bench and work. And he didn't say or do anything to make me feel safe. I went downstairs, and I was literally shaking, because I was afraid the guy was going to kill me. And I was terrified of going near this man. I didn't know what he was going to do next. And the whole ride home, you know, it was – I don't know if anyone ever did this to you. It was a horrifying experience, and now they wanted me to train with him.").

44.    Plaintiff disputes the facts set forth in Paragraph 44 and states that the deposition

13

testimony cited by defendant in support of Paragraph 44 does not support the allegation that plaintiff "never requested any accommodation," but rather contradicts it, and refers to her response to Paragraph 43. Plaintiff states, furthermore, that she requested several accommodations relating to her disabilities while employed by ACMI including repeated requests that her coworkers stop harassing her and leave her alone, that she be permitted to take a brief leave of absence, that management stop the loud music and yelling in the department, that she be transferred to the day shift, and that she not been required to continue to work near and/or be trained by King. See Ex. 1 (Schroeder) at 44-45, 78-9, 92, 114-16, 121-22, 124-25, 128-30; Ex. 3 (Gerace) at 15; Ex. 5 (Hill) at 20-21; Ex. 11 (Scaglia) at 32, 60, 90-95, 165-66; Ex. 13 (S. Schroeder) at 53-54. ACMI management denied plaintiff's requests for accommodation, failed to offer any alternative accommodations, and failed to engage in any interactive process whatsoever with plaintiff, her sister and/or her medical care providers to determine whether and what accommodations were necessary in order to allow plaintiff to continue working including and consistent with plaintiff's requests, for example, 1) not being required to continue to work near and/or be trained by King of whom she was terrified; 2) a work environment free from harassing, threatening and/or intimidating behavior that exacerbated her emotional disorders; 3) a transfer to the day shift; and/or 4) a leave of absence.

45.     Plaintiff does not dispute the facts set forth in Paragraph 45. See Ex. 19.

46.     Plaintiff does not dispute the facts set forth in Paragraph 46 and states further that

14

plaintiff's SSDI benefits were granted retroactively to December 7, 2001, the date she left her employment at ACMI, having been constructively discharged.  See Ex. 19.

47.    Plaintiff does not dispute the facts set forth in Paragraph 47 and states further that, in her initial application for benefits, she also stated that she was having problems with and was "fearful around [her] coworkers" and was also "nervous around [her] bosses."  See Ex. 19 (Bates # 547-48, 566).

48.    Plaintiff does not dispute the facts set forth in Paragraph 48 and states further that she is completely disabled from work as a result of the hostile work environment to which was subjected at ACMI.  See Exs. 17 and 18.  See also Ex. 14 (Mueller) at 128-29; Ex. 15 (Falkoff) at 129-30.

49.    Plaintiff does not dispute the facts set forth in Paragraph 49.

50.    Plaintiff does not dispute the facts set forth in Paragraph 50.

51.    Plaintiff disputes the facts set forth in Paragraph 51 and states that she complained to ACMI management about her coworkers' harassment and, furthermore, ACMI management had direct knowledge of several instances of harassment.  See e.g., Ex. 1 (Schroeder) at 62-65, 68, 76-79, 87-88; Ex. 5 (Hill) at 27-29; Ex. 11 (Scaglia) at 32, 42-43, 60, 73-4, 88-95, 164-65; Ex. 13 (S. Schroeder, plaintiff's sister) at 52-54, 95; Ex. 21-22.

52.    Plaintiff does not dispute the facts set forth in Paragraph 52, but disputes any

suggestion by defendant that those were the only complaints that plaintiff made to management and refers to her response to Paragraph 51.

53.     Plaintiff does not recall whether she stated to management that her coworkers were harassing her specifically because of her disabilities, but states that management knew that plaintiff's coworkers were harassing her because of her mental disabilities as set forth in response to Paragraph 51. See also Plaintiff's Memorandum at Sections II and III.B.1.b. Furthermore, the evidence establishes that ACMI management also harassed plaintiff on the basis of her disabilities and/or retaliated against plaintiff for complaining about her coworkers' harassment. See id. at Sections II and III.B., subsections 1.b. and 2.

54.     Plaintiff does not dispute that she did not have excessive absences and that she continued to work until December 7, 2001, but disputes any suggestion that her productivity remained the same throughout her employment, refers to her response to Paragraphs 36 and 37 and Exhibit 23, and states that the evidence cited by defendant does not support the allegations in Paragraph 54.

55.     Plaintiff disputes the facts set forth in Paragraph 55, states that it is repetitive of Paragraph 44, and refers to her response to Paragraph 44. Furthermore, plaintiff states that pp. 101 and 114 of her deposition testimony, cited by defendant in support of Paragraph 55, does not support that she "never requested any accommodation," but rather contradicts it, and refers to her

16

response to Paragraph 43.  See also Ex. 1 (Schroeder) at 100-101 ("**Q.  Did you ask Mr. Hill to be transferred to the first shift?**  A.  I think I did.  **Q.  At that time?**  A.  I think I did, yes.").

56.     Plaintiff does not have knowledge concerning whether there were any "vacancies on the first shift that she could have been transferred to" at that time, disputes that such an accommodation would have been "impossible," and states furthermore that the deposition testimony cited by defendant in support of Paragraph 56, once again, does not support, but rather, directly contradicts defendant's allegation.  See Ex. 1 (Schroeder) at 101 ("**Q.  Was there – to your knowledge, of calendar year 2001, was there a first shift position that had been available that you sort [sic] transfer to but your transfer request was denied?**  A.  I honestly can't remember that.").

57.     Plaintiff disputes that she "admitted that Mr. King was the only one available to train her on the 412 during [the second] shift" and states that the deposition testimony cited by defendant in support of Paragraph 57, once again, does not support defendant's allegation.  See Ex. 1 (Schroeder) at 95-96.  Plaintiff states furthermore that: 1) after her supervisors required that she be trained by King, she was then reassigned to be trained on the 412 by Ming Nguyen on the second shift *by her supervisors*, directly contradicting defendant's claim [see Ex. 5 (Hill) at 49-51; Ex. 11 (Scaglia) at 143-44], 2) Bing Kha, who also worked on the second shift, was also qualified to train on the 412 and, since he was the only 1st Class Medical Instrument Maker on the second shift, plaintiff would have been more appropriately assigned to be trained by him

17

rather than King who was a 2nd Class Medical Instrument Maker at the time, as set forth in detail

in plaintiff's Memorandum at Section II, and 3) as evidenced by the fact that plaintiff was

transferred to the first shift for training several times during her work history [see Ex. 20] and the

fact that she was ultimately reassigned to be trained by Charlie Harris on the first shift, there was

no reason why defendant could not have temporarily transferred plaintiff to the first shift for

training. See Ex. 5 (Hill) at 49-51; Ex. 11 (Scaglia) at 143-44.

58.    Plaintiff, once again, disputes defendant's claim that she willingly agreed to be

trained by King, states that the allegations in Paragraph 58 are repetitive of the allegations in

Paragraph 32, and refers to her response to Paragraph 32.

59.    Plaintiff, once again, does not dispute that she stated to Hill that King was

behaving like an "angel" during the training in an effort to get them to reassign her without

making them angry, states that Paragraph 59 is repetitive of Paragraph 34, and refers to her

response to Paragraph 34.

60.    Plaintiff does not dispute the facts set forth in Paragraph 60, but disputes any

suggestion that she left work voluntarily, states that Paragraph 60 is repetitive of Paragraph 43

and refers to her response to Paragraph 43.  Plaintiff states further that her employment has since

been terminated by ACMI.

61.    Plaintiff does not dispute the facts set forth in Paragraph 61, but disputes any

18

suggestion that the fact that her supervisors required that she be trained by King does not constitute harassment and/or retaliation.

62.    Plaintiff does not dispute the facts set forth in Paragraph 62.

63.    Plaintiff does not dispute the facts set forth in Paragraph 63. See Exs. 22 and 23.

64.    Plaintiff does not dispute the facts set forth in Paragraph 64, but disputes any suggestion that the employees were listed by operator number only and/or were not identifiable. See Ex. 1 (Schroeder) at 107-8 ("And they had my name on the top of the poor performance list.").

65.    Plaintiff once again disputes the suggestion that she agreed willingly to be trained by King, states that Paragraph 65 is repetitive of Paragraph 58, and refers to her response to Paragraph 58.

66.    Plaintiff does not dispute that the quoted language is contained in the CBA or that certain aspects of her employment relationship with ACMI were governed by the CBA, as stated in response to Paragraph 4, but disputes defendant's claim that the agreement "mandates a grievance process" for plaintiff's claims in this case and refers to her Memorandum at Section III.C.2..

67.    Plaintiff does not dispute the facts set forth in Paragraph 67 and refers to the CBA, attached to defendant's Memorandum of Law in Support of Summary Judgment as Exhibit B and her response to Paragraph 66.

19

68.     Plaintiff does not dispute the facts set forth in Paragraph 68 and states further that she testified as follows at deposition: "**Q.  Did you file any grievances during your entire employment?** A.  No, because I saw other people do it.  And they all said to me the same thing. Nothing gets done, and the boss just gets more angry with you.  I have seen people file grievances, and it's like a joke."  Ex. 1 (Schroeder) at 71.

69.     Plaintiff does not dispute the facts set forth in Paragraph 69.

70.     Plaintiff does not dispute that that was her sister's recollection at deposition in July 2004, but disputes that she first met with her attorney in March 2002 and refers to Exhibit 30, ¶1-2.

71.     Plaintiff does not dispute the facts set forth in Paragraph 71.


In addition to the above-referenced facts disputed by plaintiff, plaintiff states that the following facts are in dispute in this case, as set forth more fully in plaintiff's Memorandum:

1.     Whether defendant failed to engage in good faith in an interactive process with plaintiff to determine whether and what accommodations she required in order to allow her to continue working;

2.     Whether defendant denied plaintiff reasonable accommodations;

3.     Whether plaintiff was subjected to a hostile work environment at ACMI on the basis of her disabilities;

20

4.      With respect to the hostile work environment inflicted by plaintiff's coworkers, whether defendant failed to provide an "adequate avenue for complaints" or "knew of the harassment, or in the exercise of reasonable care should have known, yet failed to take appropriate remedial action";

5.      With respect to the hostile work environment inflicted by plaintiff's supervisors, whether defendant "exercised reasonable care to prevent and correct promptly [the] harassing behavior" and whether plaintiff "unreasonably failed to take advantage of any preventive or corrective opportunities provided by [ACMI] or to avoid harm otherwise."

6.      Whether plaintiff's was retaliated against – in particular, whether she suffered "adverse employment action" – for complaining about her coworkers' harassment;

7.      Whether plaintiff was constructively discharged in that she was subjected to an intolerable work environment;

8.      Whether defendant intentionally inflicted emotional distress on plaintiff and whether defendant engaged in "extreme and outrageous" behavior; and

9.      Whether defendant engaged in intentional discrimination with "malice" or "reckless indifference" to plaintiff's federally protected rights.

THE PLAINTIFF, HEIDI E. SCHROEDER

BY:_____

KATHRYN EMMETT
Federal Bar No. ct05605
CHRISTINE CAULFIELD
Federal Bar No. ct19115
EMMETT & GLANDER
45 Franklin Street
Stamford, CT  06901
(203) 324-7744
kemmett@emmettandglander.com
ccaulfield@emmettandglander.com

## CERTIFICATION

This is to certify that a copy of the foregoing was mailed, postage prepaid, this 21st day of January, 2005, to:

James M. Sconzo, Esq.
Jonathan C. Sterling, Esq.
Halloran & Sage, LLP
One Goodwin Square, 225 Asylum Street
Hartford, CT  06103.4303

_____
Kathryn Emmett

22