(Ranita) at 93 (King drove up so fast and close behind plaintiff that he (Ranita) said "whoa, whoa" and "put [his] hand up.").

Apparently management simply disregarded plaintiff's report concerning this harassing and threatening incident. When questioned at deposition about plaintiff's report to management that King "had tried to run her off the road" and the fact that the police were called, ACMI's then Human Resources Director, Ed Roche, testified that he was "not aware of that or recall any involvement with anything like that," even though he admitted that the incident should have been documented and an investigation should have been conducted because "as a responsible manager, you'd want to assure that any behavior that happens off premises is going to be either addressed or resolved or not impact what goes on on the premises." Ex. 10 (Roche) at 25, 47.

Furthermore, even though plaintiff's supervisor, John Scaglia, was aware that plaintiff was extremely frightened by the incident, he directed plaintiff to "go back to her bench [in the same area where King was working] and work" immediately after the incident as if nothing had happened. See Ex. 1 (Schroeder) at 114 ("I remember running upstairs to Human Resources, and John Scaglia was sitting at a desk with some woman. And I told John, Fred is here. And he said so what? Go back to your bench and work. And he didn't say or do anything make me feel safe. I went downstairs, and I was literally shaking, because I was afraid the guy was going to kill me."); Ex. 11 (Scaglia) at 93 (admitting that plaintiff appeared frightened by the incident).

Plaintiff's coworkers laughed and made fun of her for reporting the incident to the police and when Scaglia witnessed plaintiff's upset over the situation he instructed her once again that her reaction would only make them more angry at her. See Ex. 1 (Schroeder) at 88, 106; Ex. 11 (Scaglia) at 165; Ex. 29, ¶7.

After this incident, plaintiff reiterated to her supervisors that she was frightened of King, but nothing was ever done to alleviate plaintiff's fears, to reprimand King, to investigate the incident, or *even* to document the incident. See Ex. 1 (Schroeder) at 125; Ex. 5 (Hill) at 27-29 (admitting that plaintiff told him about the incident after he became her supervisor), 93 (and that he understood plaintiff was frightened of King). The fact that ACMI did not respond in any way to plaintiff's complaint about King's conduct indicated a reckless lack of concern for her emotional and physical safety. Furthermore, Scaglia denied a request by plaintiff to be transferred to the day shift to get away from King and the other coworkers who were harassing her. See Ex. 11 (Scaglia) at 169-70; Ex. 29, ¶11, 13; Amended Complaint, ¶15.

In or about April 2001, Scaglia became supervisor of plaintiff's department working on the day shift. See Ex. 11 (Scaglia) at 15-16. Dan Hill took over as 2nd shift supervisor at the end of May 2001. See Ex. 5 (Hill) at 6; Def.Mem., Ex. E. Plaintiff informed Hill that she was being treated for depression and that she didn't want to be bothered by her coworkers and just wanted to be "left alone." Ex. 5 (Hill) at 20-21. See also Ex. 1 (Schroeder) at 124. She also discussed the threatening incident involving Fred King with Hill, and Hill understood that plaintiff was afraid of King. See Ex. 5 (Hill) 27-29, 93; Ex. 1 (Schroeder) at 125.

In the fall of 2001, a 1st Class Medical Instrument Maker position opened up on the second shift. See Ex. 1 (Schroeder) at 92-93; Ex. 11 (Scaglia) at 109-10.[5] Plaintiff, who had

---

[5] The second shift had only one 1st Class Medical Instrument Maker at the time, Binh Kha. See Ex. 5 (Hill) at 34. Dan Hill testified at deposition that management was considering promoting a total of two to three additional 2nd Class Medical Instrument Makers to 1st Class in order to form a second shift line of 1st Class Medical Instrument Makers. See id. at 33, 37. The candidates for promotion, in order of seniority, were plaintiff, Ha Trinh, Chris Ranita and Fred King. See id.; Ex. 11 (Scaglia) at 112, 159; Exs. 24-25. Ultimately, only two additional individuals were promoted to 1st Class – Ranita and King. See Ex. 6 (King) at 31-34.

10

repeatedly expressed a desire to be promoted to 1st Class, was entitled to be considered first for promotion to the position by virtue of her seniority in the department. See Ex. 5 (Hill) at 32-35; Ex. 11 (Scaglia) at 110.[6] Incredibly, despite their knowledge concerning King's harassment of plaintiff and, in particular, that he had physically threatened plaintiff when he tried to run her car off the road, and that she was emotionally unstable and terrified of King, plaintiff's supervisors told plaintiff that she would have to be trained by King and work next to King on an assembly line if she wanted the promotion to 1st Class. See Ex. 1 (Schroeder) at 114-16 ("When they told me I had to train with him, I knew – you know, I think John said look – John or Dan said to me look, if you want to be first class, you're going to have to train with Fred. That's the way it's got to be. . . . And I was scared, but you know that is what they said. That's the way it has to be. So when it came down to it, I was terrified."); Ex. 5 (Hill) at 39. See also Ex. 13 (S. Schroeder) at 151-52.

The decision to assign plaintiff to be trained by King was unprecedented, deliberately cruel, and calculated to make plaintiff fail. Standard procedure called for plaintiff to be assigned to a group leader for training or, at the very least, to an employee who already held a 1st Class Medical Instrument Maker position. See Ex. 3 (Gerace) at 20-22. Like plaintiff, King was a 2nd Class Instrument Maker, but he had less seniority in the position. See Ex. 11 (Scaglia) at 131; Ex. 6 (King) at 28-33.[7] In fact, as plaintiff's supervisors knew, King was also seeking promotion

---

[6] Eligibility for open positions was determined based on qualifications and seniority. If an employee met the minimum qualifications for the position and had seniority within the department, he or she would be permitted the first opportunity to train for a position and, if successful at learning the necessary skills, would be promoted. See Ex. 5 (Hill) at 34-35; Ex. 11 (Scaglia) at 113.

[7] ACMI claims that it was not unusual for plaintiff to be assigned to be trained by a 2nd Class Medical Instrument Maker because she was being trained to perform a skill called a 412 that was

11

to 1st Class and, therefore, had reason to want plaintiff to fail in her training because if she succeeded there would potentially be no 1st Class position available to him. See Ex. 11 (Scaglia) at 112, 142; Ex. 6 (King) at 28-34.[8]

Plaintiff understood, based on what Hill told her, that she had to agree to be trained by King if she wanted the promotion. See Ex. 1 (Schroeder) at 128-29 (Scaglia or Hill told her "if you want to be first class, you're going to have to train with Fred. That's the way it's got to be."). See also Ex. 5 (Hill) at 42-43 ("[Scaglia] told me that they wanted [King] to teach her because he was the best at the job, and they were – [plaintiff is] asking to work with [King], and [Scaglia] wanted to make sure that there was not going to be any conflict."); Ex. 24 at 77 (Hill notes). Therefore, even though she continued to be extremely fearful of King, plaintiff began the training with him. See Ex. 1 (Schroeder) at 94, 128-29.[9]

When she began training with King and was required to interact with him, plaintiff began to disintegrate emotionally and went to the shop steward, Maria Gerace, to request help. See Ex. 3 (Gerace) at 15 ("[plaintiff] came to me and told me she was very nervous about being trained

---

required in order to be promoted to 1st Class, but was actually performed by 2nd Class workers. ACMI management was unable, however, to identify any other employee who had been assigned to be trained for a promotion by an employee of the same class. See Ex. 11 (Scaglia) at 185; Ex. 5 (Hill) at 41; Ex. 12 (Tarca) at 39; Ex. 2 (Arotsky) at 23.

[8] As stated *supra* at n.5, King was, in fact, promoted to 1st Class, as was Chris Ranita, but only after plaintiff and one other employee with more seniority than King and Ranita, Ha Trinh, failed in their attempts for promotion to 1st Class. See Ex. 5 (Hill) at 81; Ex. 6 (King) at 30-34; Ex. 9 (Ranita) at 46; Exs. 25 and 26.

[9] ACMI claims that plaintiff willingly agreed to be trained by King. Plaintiff disputes this claim. In fact, she reiterated to Hill and/or Scaglia when they informed her about the training assignment that she was afraid of King, but, as stated, she was told that she would have to be trained by King and work on a line with King if she wanted the promotion. See Ex. 1 (Schroeder) at 114-16, 124-25, 128-30; Ex. 24 at 77 (Hill notes). Having been informed that she had no choice if she wanted the promotion, plaintiff agreed to be trained by King. See id. See also Ex. 13 (S. Schroeder) at 151-52.

12

with Fred King."). See also Ex. 13 (S. Schroeder) at 155 ("I think after being told that she had to train with Fred and being so stressed out and worried by that, you know, she just couldn't take it."). Ms. Gerace then asked Hill and Scaglia to reassign plaintiff to be trained by the group leader, but they refused, according to Gerace, "adamant that [plaintiff] needed to get along with her co-workers." Id. Plaintiff herself spoke with Hill and stated that, even though King was being an "angel," she wanted to be trained by someone else with whom she felt she could learn better, in an effort to get her supervisors to reassign her without making them angry. See Ex. 1 (Schroeder) at 94 (she told Hill that King was acting like an angel during training because she was terrified of losing her job or making him angry).

After a few days of training with King, plaintiff, who by then had become an emotional wreck, was no longer able to concentrate, and was breaking the medical instruments she was being trained to assemble, was finally reassigned by her supervisors to be trained by Ming Nguyen and then by Charlie Harris, a group leader, on the day shift. See Ex. 11 (Scaglia) at 143-44; Ex. 5 (Hill) at 49-51. See also Ex. 1 (Schroeder) at 113, 120; Ex. 24 at 79 (Scaglia notes). By this time, however, as a result of being subjected to months of a hostile work environment, culminating in the requirement that she be trained by King, plaintiff's emotional status had been completely compromised and she was unable to continue working. On or about December 7, 2001 plaintiff left ACMI on short term disability leave, having been constructively discharged.[10]

---

[10] After plaintiff went out on disability leave, plaintiff's sister, Susan Schroeder, complained to Maria Gerace, a union steward at ACMI, and Gerace brought to Stanley Opalenik's attention (Opalenik was the incoming Human Resources manager) that there were issues about the fairness of plaintiff's training. See Ex. 8 (Opalenik) at 12; Ex. 163 (S. Schroeder) at 59-60. Opalenik spoke to Scaglia and Hill to ascertain their version of the events and decided that plaintiff had been given a fair training opportunity based solely on her supervisors' explanation that they had assigned her to three different trainers but was still having difficulty and "basically just walked off the job." See Ex. 8

In May 2002, when plaintiff's short term disability leave was coming to an end, ACMI contacted her to return to work on the second shift in the same work environment that had caused her to suffer an emotional breakdown in December 2001. See Amended Complaint, ¶22. Plaintiff was unable to return to work because she was totally disabled as a result of the hostile work environment and/or retaliation to which she was subjected at ACMI and, in particular, by the fact that her supervisors required her to be trained by King of whom she was terrified because of his dangerous and unchecked threatening conduct toward her. See id. Plaintiff applied for and was granted Social Security disability insurance [SSDI] benefits, retroactive to the date she became totally disabled from working at ACMI, December 7, 2001. See Ex. 19.

The cause and extent of plaintiff's emotional injuries have been verified by plaintiff's treating doctors – Alan Falkoff, M.D., her family doctor, and F. Carl Mueller, M.D., her psychiatrist. Both Dr. Falkoff and Dr. Mueller were treating plaintiff prior to the emotional breakdown she suffered after being required to be trained by King, and both have expressed the opinion that she has experienced and continues to experience great emotional distress and, in fact, became totally disabled from work due to the emotional injury she sustained as a result of the treatment to which she was subjected at ACMI. See Ex. 14 (Mueller) at 128-29; Ex. 15 (Falkoff) at 129-30; Ex. 17 (Mueller report); Ex. 18 (Falkoff report).[11]

Dr. Mueller has diagnosed plaintiff with Post Traumatic Stress Disorder and Recurrent

---

(Opalenik) at 13-16. Opalenik did not speak with plaintiff or look into the history of harassment against her or the justification for or effect of her supervisors' decision to assign plaintiff to be trained by King. See id.

[11] The change in plaintiff's condition as a result of the hostile work environment to which she was subjected at ACMI is reflected in the photographs of plaintiff attached as Exhibit 32.

14

Major Depression. See Ex. 17. Dr. Mueller states, in his report, that he started seeing plaintiff in October 2001 "secondary to the depression symptoms associated with the death of her mother" and that, following her mother's death, she "underwent substantial stresses at work" including, in particular, the car incident involving King. See id. In Dr. Mueller's opinion, plaintiff's supervisors' requirement that she continue to work near and be trained by King following the incident:

> began disorganizing [plaintiff] and causing severe episodes of agitation. These episodes escalated further to the point where she became incapable of working and eventually had to go out on disability. . . .
>
> [Plaintiff's] depressive symptoms dramatically increased after [the training by King] began. She also developed new symptoms, which include severe panic, agoraphobia, and fears of the workplace, intrusive dreams, nightmares, a startle response and clear flashbacks. These symptoms socially paralyzed her and led to severe chronic disability.
> . . .
> In summary, [plaintiff] suffers from a profound depression and posttraumatic [stress] disorder that has left her permanently disable[d]. I believe, with reasonable medical certainty, that her disorder is causally related to her traumas of her former employment.

Id.[12]

Plaintiff first contacted an attorney about her circumstances on May 10, 2002, when her short term disability leave from ACMI was coming to an end and after the Social Security

---

[12] Walter Borden, M.D., the psychiatrist who examined plaintiff on behalf of ACMI, agrees that plaintiff is totally disabled from work. See Ex. 16 (Borden) at 24, 63. Dr. Borden attributes plaintiff's emotional breakdown to the death of her mother [see Ex. 28], but does not explain how she was able to continue working productively for nearly two years after her mother's death before she became unable to work. See Ex. 16 (Borden) at 83-87. In addition, Dr. Borden attempts to explain plaintiff's perception that she was being harassed at work by opining that she is paranoid and delusional. See Ex. 28. Plaintiff's treating doctors disagree absolutely with this opinion and the psychological testing Dr. Borden did does not support it. See Ex. 28; Ex. 16 (Borden) at 32-25, 39-40; Ex. 14 (Mueller) at 134-44; Ex. 17; Ex. 18. Furthermore, at deposition, Dr. Borden refused to accept the "hypothetical" assumption that King had driven fast up behind plaintiff in a threatening manner, but indicated that if this had in fact happened it would be predictable or understandable that plaintiff would suffer PTSD as a result of being required to be trained by King after the incident. See Ex. 16 (Borden) at 64-65, 89.

Administration denied her initial application for SSDI benefits. See Affidavit of Plaintiff Heidi Schroeder dated January 21, 2005 [Plaintiff's Aff.], submitted herewith, ¶2; Ex. 30, ¶1. At the time plaintiff contacted counsel, she was "very fearful of anything that had to do with ACMI" and was afraid that if she pursued a claim against ACMI, there would be reprisals from ACMI employees. See Plaintiff's Aff., ¶3-4. Plaintiff spoke to her doctors and her sister, Susan Schroeder, about the possibility of bringing a claim and they attempted to alleviate her fears, but plaintiff was emotionally incapable of making a decision to pursue a claim until June 12, 2002, when she finally retained counsel for that purpose. See id., ¶5. See also Ex. 14 (Mueller) at 43-44, 46, 50-51, 52-53 (testifying that his treatment notes for the first half of 2002 reflect, *inter alia*, that plaintiff was extremely fearful of returning to work at ACMI, that she was having flashbacks of the work environment, and, on May 14, 2002, after consulting with counsel, that she was "[v]ery anxious, very panicky," and "very fearful of reprisals from work."). Counsel for plaintiff filed an appeal of the denial of plaintiff's SSDI benefits on or about July 1, 2002 [see Ex. 19], and filed plaintiff's administrative complaint with the CHRO on or about July 2, 2002, immediately after plaintiff signed the complaint and approximately 207 days after plaintiff left her employment at ACMI, having been constructively discharged. See Plaintiff's Aff., ¶7; Ex. 31.

## III.  ARGUMENT

### A.  STANDARDS

In reviewing a motion for summary judgment, the "court must 'resolve all ambiguities and inferences . . . in the light most favorable to the party opposing the motion,' United States v. One Tintoretto Painting, 691 F.2d 603, 606 (2d Cir.1982) (citations omitted), and may grant the

motion only if 'there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law.' Fed. R. Civ. P. 56(c)." Celotex Corp. v. Catrett, 477 U.S. 317, 331 (1986). See also Rattner v. Netburn, 930 F.2d 204, 209 (2d Cir.1991). Defendant, as the moving party, has the burden of demonstrating clearly the absence of any genuine issue of fact and showing its entitlement to a favorable determination under applicable principles of substantive law. See Adickes v. S. H. Kress & Co., 398 U.S. 144 (1970). On summary judgment, the court must not try issues of fact; rather it must only determine whether there are such issues to be tried. See Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 36-37 (2d Cir.1994). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." Id.

"[I]n an employment discrimination case when, as here, the employer's intent is at issue, the trial court must be especially cautious about granting summary judgment." Kerzer v. Kingly Manufacturing, 156 F.3d 396 (2d Cir.1998). See also Distasio v. Perkin Elmer Corporation, 157 F.3d 55, 61 (2d Cir.1998) ("Summary judgment should be used 'sparingly' when, as is often the case in [] harassment claims, state of mind or intent are at issue."); Dobrich v. General Dynamics Corp., 40 F.Supp.2d 90, 94 (D.Conn. 1999) ("the Second Circuit has held that a district court should exercise particular caution when deciding whether summary judgment should issue in an employment discrimination case.").

### B. DEFENDANT IS NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S DISCRIMINATION AND RETALIATION CLAIMS

#### 1. Plaintiff was discriminated against because of her disability.

Under the ADA, "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to . . .", *inter alia*, "advancement, or discharge . . ., job training, and other terms, conditions and privileges of employment." 42 U.S.C. §12112(a).[13] In order to establish a *prima facie* case of discrimination under the ADA, a plaintiff must show that:

> (a) his employer is subject to the ADA; (b) he suffers from a disability within the meaning of the ADA; (c) he could perform the essential functions of his job with or without reasonable accommodation; and (d) he was discriminated against because of his disability.

Distasi v. Sikorsky Aircraft Corporation, 1999 WL 1421655, *2 (D.Conn., Nov. 29, 1999, Burns, J.) (Citing Reeves v. Johnson Controls World Services, 140 F.3d 144, 149-50 (2d Cir.1998). See also Worthington v. City of New Haven, 1999 WL 958627, *6 (D.Conn., Oct. 5, 1999, Burns, J.) (plaintiff's *prima facie* case may be established by proof that: (1) [she] has a "disability" within the meaning of the statute; (2) her employer is covered by the statute and had notice of [her] disability; (3) she could perform the essential functions of the job she holds or desires, with or without reasonable accommodations; and (4) she was subject to an adverse employment action because of her disability *or* her employer refused to make reasonable accommodations)

---

[13] Similarly, the CFEPA makes it illegal for an employer to "discriminate against [an employee] . . . in terms, conditions or privileges of employment because of the individual's . . . present or past history of mental disability . . ." C.G.S. §46a-60. "In defining the contours of an employer's duties under [Connecticut] state antidiscrimination statutes, [Connecticut courts] have looked for guidance to federal case law interpreting Title VII of the Civil Rights Act of 1964, the federal statutory counterpart to [C.G.S. §46a-60]." Brittell v. Dep't of Correction, 247 Conn. 148, 164 (1998). See also Newtown v. Shell Oil Company, 52 F.Supp.2d 366, 374 (D.Conn. 1999).

18

(emphasis added).[14]

The evidence in this case supports that plaintiff, who was suffering from depression and anxiety, was discriminated against on the basis of her disabilities in that defendant: 1) failed to engage in good faith in an interactive process with plaintiff in order to determine whether and what accommodation she required and denied plaintiff reasonable accommodations that would have allowed her to continue working, and 2) subjected plaintiff to an ongoing hostile work environment that ultimately lead to plaintiff's complete emotional breakdown and constructive discharge from the company.

### a. Defendant failed to engage in good faith in an interactive process with plaintiff and denied her reasonable accommodations for her disabilities.

Pursuant to 42 U.S.C. §12112(b)(5)(A), prohibited discrimination includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . ., unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer]." 42 U.S.C. §12112(b)(5)(A). Reasonable accommodation means, *inter alia*:

> [] Modifications or adjustments to the work environment, or to the manner or circumstances under which the position . . . is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position; or

> [] Modifications or adjustments that enable a covered entity's employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities.

---

[14] Defendant does not contest that it is subject to the ADA and CFEPA, that plaintiff is disabled within the meaning of the ADA and CFEPA, or that plaintiff could perform the essential functions of her position with or without reasonable accommodation [see Def.Mem. at 16-17], and, therefore, only the fourth prong of plaintiff's *prima facie* case – whether she was discriminated against because of her disability – is at issue here.

19

29 C.F.R. §1630.2(o)(1).[15] Examples of reasonable accommodation include, but are not limited to:

> job restructuring, part-time or modified work schedules, reassignment to a vacant position, . . . and other similar accommodations for individuals with disabilities.

42 U.S.C. §12111(9)(b). See also 29 C.F.R. §1630.2(o)(2)(ii); 29 C.F.R. §1630, App. §1630.2(o) ("In general, an accommodation is any change in the work environment or in the way things are customarily done that enables an individual with a disability to enjoy equal employment opportunities.").

Once an employee requests accommodation for disabilities, an employer must engage in an "informal, interactive process" with the disabled individual in order to determine appropriate reasonable accommodations. See 29 C.F.R. §1630.2(o)(3); 29 C.F.R. §1630, App. §1630.9. See also Williams v. Philadelphia Housing Authority Police Department, 380 F.3d 751, 771 (3d Cir.2004) ("employer has a duty under the ADA to engage in an 'interactive process' of communication with an employee requesting an accommodation so that the employer will be able to ascertain whether there is in fact a disability and, if so, the extent thereof, and thereafter be able to assist in identifying reasonable accommodations where appropriate."); Humphrey v.

---

[15] Defendant argues that plaintiff was not entitled to accommodations while working at ACMI because she was "not unable to work" at the time. See Def.Mem. at 17-18. The law does not require that plaintiff be unable to work in order to be entitled to a workplace accommodation. See Jacques v. Clean-up Group, Inc., 96 F.3d 506, 515 n.9 (1st Cir.1996) ("We recognize that, even when qualified employees are able to perform the job's essential functions, employers may not be relieved of their duty to accommodate where accommodations are required to allow equal enjoyment of employment privileges and benefits . . ."); Buckingham v. United States, 998 F.2d 735, 740-41 (9th Cir.1993) ("employers are not relieved of their duty to accommodate when employees are already able to perform the essential functions of a job . . . we have found nothing in the Act or its legislative history to indicate that Congress intended to limit the employer's duty of reasonable accommodation to the facilitation of employment tasks."); Majtan v. Pilling Weck, 2000 WL 1386321, *6 (E.D.Pa., Sept. 22, 2000). Defendant's argument is, furthermore, invalid because, as set forth in Section III.B.4., *infra*, it was defendant's conduct that caused plaintiff's total disability from work.

20

Memorial Hospitals Association, 239 F.3d 1128, 1137 (9th Cir.2001) (same); Gile v. United Airlines, Inc., 213 F.3d 365, 373 (7th Cir.2000) (once an employee notifies employer of disability and requests accommodation, employer has duty "to engage in a flexible, interactive process with the disabled employee needing accommodation so that, together, they might identify the employee's precise limitations and discuss accommodation which might enable the employee to continue working.") (Quotations omitted).

The interactive process requires that the employer act in good faith in exploring possible accommodations with a disabled employee. See Humphrey at 1137 ("Employers, who fail to engage in the interactive process in good faith, face liability for the remedies imposed by the statute if a reasonable accommodation would have been possible."); Barnett v. U.S. Air, Inc., 228 F.3d 1105, 1111-16 (9th Cir.2000), *vacated and remanded on other grounds*, 535 U.S. 391 (2002), (summary judgment must be denied where there is a genuine dispute as to whether employer engaged in good faith in interactive process). See also Worthington v. City of New Haven, 1999 WL 958627, *13 (D.Conn., Oct. 5, 1999, Burns, J.) ("courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary.") (Quoting Beck v. University of Wisconsin Board of Regents, 75 F.3d 1130, 1135 (7th Cir.1996)); Merry v. A. Sulka & Company, Ltd., 953 F.Supp. 922, 927 (N.D.Ill. 1997) ("Ultimately whether an employer's accommodations are judged reasonable turns on whether the employer made a good faith effort to assess the employee's needs and respond to them.") (Citation and quotations omitted).

21

> The employer should meet with the employee who requests an accommodation, request information about the condition and what limitations the employee has, ask the employee what he or she specifically wants, show some sign of having considered the employee's request, and offer and discuss available alternatives when the request is too burdensome.

Taylor v. Phoenixville School District, 184 F.3d 296, 317 (3rd Cir.1999). See also Barnett at 1115; 29 C.F.R. §1630, App. §1630.9.

Furthermore, the employer's burden to initiate and engage in the interactive process is higher where the employee has a mental illness that prevents him or her from communicating effectively about his or her disability and need for accommodation. See Bultemeyer v. Fort Wayne Community Schools, 100 F.3d 1281, 1285-87 (7th Cir.1996) (recognizing that obligation on employer to engage in interactive process is greater when employee suffers from mental illness and is incapable of articulating that he wants accommodation for his disability). See also Taylor at 314-15 (employer who had notice of employee's psychotic episode and subsequent hospitalization "had more than enough information to put it on notice that [employee] might have a disability, and therefore, in order to trigger the [employer's] obligation to participate in an interactive process, . . ."); Criado v. IBM Corporation, 145 F.3d 437, 444-45 (1st Cir.1998) (upholding jury determination that employer discriminated against employee on basis of her disability where employer knew of employee's mental impairment but failed to engage in interactive process to determine what accommodations would allow her to return to work and instead terminated her employment claiming it had not received or misunderstood her request for additional leave as accommodation).

The evidence in this case, as set forth in detail in the Statement of Facts, supports that

22

ACMI management was aware that plaintiff was suffering from emotional disabilities following the death of her mother and that she was having trouble functioning in the workplace. Plaintiff made several requests for accommodation including repeated requests that her coworkers stop harassing her and leave her alone, that she be permitted to take a brief leave of absence, that management stop the loud music and yelling in the department, that she be transferred to the day shift, and that she not been required to continue to work near and/or be trained by King. ACMI management denied plaintiff's requests for accommodation, failed to offer any alternative accommodations, and failed to engage in any interactive process whatsoever with plaintiff and/or her medical care providers to determine whether and what accommodations were necessary in order to allow plaintiff to continue working including, consistent with plaintiff's requests, for example, 1) that she not be required to continue to work near and/or be trained by King of whom she was terrified; 2) a work environment free from harassing, threatening and/or intimidating behavior that exacerbated her emotional disorders; 3) a transfer to the day shift; and/or 4) a leave of absence.[16]

In an analogous case, Bultemeyer v. Fort Wayne Community Schools, the Seventh Circuit Court of Appeals reversed summary judgment in favor of the employer school district, finding genuine issues of material fact existed concerning whether the employer failed to engage in good faith in an interactive process with Bultemeyer, a former custodian who was suffering from bipolar disorder, anxiety attacks and paranoid schizophrenia, and denied him reasonable accommodation. See Bultemeyer, 100 F.3d 1281, 1283-87 (7th Cir.1996). The school district

---

[16] As set forth infra at Section III.B.3., plaintiff also claims that she was subjected to a hostile work environment on the basis of her disabilities. Some of these possible "accommodations" should be viewed also as steps that defendant should have taken to stop the hostile work environment.

employee relations director had informed Bultemeyer, who was planning to return to work following disability leave, that he would not receive any special accommodation at his new assignment as he had previously at other assignments, and a custodial foreman commented to Bultemeyer that he would never get his work done on time at his new assignment if he "moved as slowly while he worked," leading Bultemeyer to believe that he would not be able to meet their expectations in the new position. Id. at 1282. Bultemeyer told the employee relations director that he could not work at the new assignment and "did not think he was equal to the task" and requested a "less stressful" position through his psychiatrist, but failed to report for a required physical and to work at his new assignment, resulting in the termination of his employment. Id.

The Seventh Circuit found Bultemeyer's request for a less stressful position sufficient to trigger the school district's duty to engage in an interactive process with Bultemeyer under the circumstances, noting that "properly participating in the interactive process means that an employer cannot expect an employee to read its mind and know that he or she must specifically say 'I want a reasonable accommodation,' particularly when the employee has a mental illness," and while "the irrationality of [Bultemeyer's] fears [about the new assignment] may be frustrating to [the school district], . . ., [the school district] had a duty to engage in the interactive process and find a reasonable way for him to work despite his fears." Id. at 1285. Instead, the school district "made no inquiry about what Bultemeyer found stressful [about the new assignment]" and simply denied his request for accommodation. Id. at 1286-87 ("Since [employee relations director] knew he was mentally ill, it seems eminently reasonable that she would ask him to explain his fears, or call his doctor. But it appears that [the school district] was tired of having to accommodate Mr. Bultemeyer's disability, and when it had the opportunity, it

24

got rid of him.").

Thus, like the instant case, the plaintiff in Bultemeyer suffered from mental disabilities which impacted his ability to communicate his request for accommodation to his employer in an effective manner, and, like the instant case, the employer disregarded the employee's fears or stress over the workplace environment as irrational and failed to engage in good faith in an interactive process with him in order to understand his difficulties and determine what accommodations were necessary in order to allow him to continue working. See Bultemeyer at 1285 ("had [the school district] accommodated Bultemeyer by finding him another position or by simply sitting down with him and talking about the situation, he may have been willing and able to take the physical and report for work.").

Similarly, in Norman v. University of Pittsburgh, the defendant university reassigned the plaintiff, who suffered from depression, anxiety and panic disorders, to clean five and half floors of a building which involved cleaning labs, despite knowledge that plaintiff's anxiety disorder was exacerbated by cleaning labs due to a puncture wound she had suffered from an unknown object while cleaning a lab previously and despite the fact that the university had previously accommodated her request not to have to clean labs. See Norman, 2002 WL 32194730, *1 (W.D.Pa., Sept. 17, 2002, Ambrose, J.). When plaintiff complained about the new assignment, management responded that she "'just had to do it.'" See id. After four days of attempting the assignment, plaintiff "broke down and left" on short-term disability leave. See id.

The court denied summary judgment on the issue of reasonable accommodation finding sufficient evidence, *inter alia*, that the university could have accommodated plaintiff's request that she not be required to clean labs as it had done in the past without undue hardship. See id. at

25

*17. Furthermore, the court found that two alternative positions offered by the university were not reasonable accommodations as a matter of law. See id. at *18-19 ("A jury could conclude that by offering a position which involved working alone, at night, in an area known to be dangerous, the University had not proposed this accommodation in good faith to a person known to be suffering from anxiety and panic disorders" and "whether an accommodation is reasonable is a question for the jury.").

Like the instant case, the employer in Norman failed to engage in good faith in the interactive process with the employee and failed to provide reasonable accommodations that would have addressed her difficulties in the workplace and allowed her to continue working. See also, e.g., Calero-Cerezo v. United States Department of Justice, 355 F.3d 6, 24-25 (1st Cir.2004) (summary judgment denied on issue of whether employer failed to provide reasonable accommodation to employee who had requested transfer to another office due to poor working relationship with supervisor where "employer made no effort to offer any realistic alternative accommodation, or even to discuss the difficulties that plaintiff's major depression was creating for her at work"); Gile v. United Airlines, Inc., 213 F.3d 365, 370-73 (7th Cir.2000) (upholding jury determination that employer violated ADA based on evidence that management refused employee's requests for transfer to the day shift to accommodate her depression and anxiety disorder on the basis that "'it sounded like a personal problem,'" and "then did nothing to engage with [plaintiff] in determining alternative accommodations that might permit [plaintiff] to continue working," but rather suggested that [plaintiff] "'just resign and stay home.'"); Taylor v. Phoenixville School District, 184 F.3d 296 (3rd Cir.1999) (summary judgment in favor of employer reversed where employer had "enough information to put it on notice that [employee]

26

might have a disability, and therefore, in order to trigger the school district's obligation to participate in the interactive process" where employee became psychotic at work and was hospitalized and son subsequently informed school district that she would require some accommodation upon her return, but "[n]otwithstanding [employee's] previous twenty years of strong performance and the school district's clear notice of [her] disability and desire for accommodations, the school district offered no accommodations or assistance in finding them, made [her] job more difficult [upon her return], and simply sat back and continued to document her failures."); Criado v. IBM Corporation, 145 F.3d 437, 444 (1st Cir.1998) (upholding jury determination that employer denied reasonable accommodation of extended leave for employee who was suffering from anxiety disorder and depression in order to allow physician to "design an effective treatment program"); Feliberty v. Kemper Corporation, 98 F.3d 274, 280 (7th Cir.1996) (summary judgment reversed where evidence supported that employer did not engage in interactive process in good faith and did not take plaintiff's condition or his request for accommodation seriously); Kennelly v. Pennsylvania Turnpike Commission, 208 F.Supp.2d 504, 513-14 (E.D.Pa. 2002) (material issues of fact existed concerning whether plaintiff, who suffered from panic disorder, could have performed job with reasonable accommodation and whether the employer engaged in good faith in an interactive process with plaintiff to determine whether accommodations were feasible where plaintiff was hired by defendant as an emergency response worker, but suffered a "debilitating emotional breakdown" one week later after defendant told plaintiff he was going to be assigned to work on his own from then on, but denied plaintiff's requests for additional training and a transfer to a less stressful position).

Thus, whether ACMI failed to engage in good faith in an interactive process with plaintiff