to determine what accommodations would have allowed her to continue working and denied plaintiff reasonable accommodations cannot be determined as a matter of law in this case, and summary judgment on this issue must be denied.[17]

### b. Defendant subjected plaintiff to a hostile work environment.

In order to establish a "hostile work environment," a plaintiff must show that his or her "workplace was permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Distasio v. Perkin Elmer Corporation, 157 F.3d 55, 62 (2d Cir.1998) (quoting Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993)) (quotations

---

[17] Defendant argues that it is entitled to summary judgment on plaintiff's state law claim for denial of reasonable accommodation on the basis that no Connecticut appellate court has recognized that such a claim exists under the CFEPA and, unlike the ADA, C.G.S. §46a-60 does not, on its face, require an employer to provide reasonable accommodation to a disabled employee. See Def.Mem. at 30-32. While the Connecticut Supreme Court has not yet addressed the issue of whether a claim for disability discrimination on the basis of failure to make reasonable accommodation exists under the CFEPA, Connecticut courts that have considered the issue have recognized such a claim or assumed that such a claim exists. See e.g., Curry v. Allen S. Goodman, Inc., 2004 WL 3048590 (Conn.Super., Nov. 18, 2004, Stengel, J.) ("failure to impose upon state actions so prominent a federal requirement as the duty to reasonably accommodate would vitiate the remedial purposes of the Connecticut antidiscrimination statutes"); Trimachi v. Connecticut Workers Compensation Committee, 2000 WL 872451, *6-7 (Conn.Super., June 14, 2000, Devlin, J.) (recognizing such a claim on the grounds that, *inter alia*, "Connecticut antidiscrimination statutes are at least coextensive with their federal counterparts" and CHRO decisions have consistently recognized a duty to provide reasonable accommodation under Connecticut state law). See also Hill v. Pfizer, 266 F.Supp.2d 352, 364 (D.Conn. 2003) (denying summary judgment on issue of whether defendant failed to accommodate plaintiff under CFEPA, citing Trimachi); Ezikovich v. Commission on Human Rights and Opportunities, 57 Conn.App. 767, 774-75, *cert. denied*, 253 Conn. 925 (2000) (upholding determination that employer provided employee with reasonable accommodation under federal and state law and noting that "although [plaintiff's] claim is based largely on violations of state statutes, we review federal precedent concerning employment discrimination for guidance in enforcing our own antidiscrimination statutes.") (Citation and quotations omitted); Conte v. New Haven Board of Education, 2003 WL 21219371, *4 (Conn.Super., May 15, 2003, Skolnick, J.) (assuming cause of action exists); Infante v. Thomas, 2001 WL 822217 (Conn.Super., June 21, 2001, Moran, J.) (same).

omitted).[18] "Whether an environment is 'hostile' or 'abusive' depends on the totality of the circumstances." Id. Therefore,

> [c]ourts must consider a variety of factors including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'

Id. See also Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 81-2 (1998) ("The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed."); Durham Life Insurance Company v. Evans, 166 F.3d 139, 149 (3rd Cir.1999) ("Particularly in the discrimination area, it is often difficult to determine the motivations of an action and any analysis is filled with pitfalls and ambiguities. A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario.") (Citations and quotations omitted).

"These factors must be evaluated from both a subjective and an objective viewpoint."

---

[18] Although the Second Circuit Court of Appeals has not explicitly decided whether a claim for hostile work environment exists under the ADA, courts that have considered the issue, including several federal courts of appeals and Second Circuit district courts, have decided that such a claim is cognizable. See Shaver v. Independent Stave Company, 350 F.3d 716, 719 (8th Cir.2003); Fox v. General Motors Corporation, 247 F.3d 169, 176 (4th Cir.2001); Flowers v. Southern Regional Physician Services Inc., 247 F.3d 229, 233 (5th Cir.2001); Johnson v. City of New York, 326 F.Supp.2d 364, 371 (E.D.N.Y. 2004) ("Although the Second Circuit has not determined whether the ADA gives rise to a cause of action for hostile work environments, several district courts in this circuit have held that such claims are cognizable.") (Citation omitted); Disanto v. McGraw-Hill, Inc./Platt's Division, 1998 WL 474136, *5 (S.D.N.Y., Aug. 11, 1998, Koeltl, J.) ("defendant cannot point to any case in which a court has found that [] a "hostile work environment" claim does not exist under the ADA, and, indeed, several district courts in [the Second Circuit] have determined that such a claim is cognizable under the ADA."). In reviewing claims for hostile work environment under the ADA, courts apply the same standards applicable to such claims under Title VII. See e.g., Shaver at 720; Fox at 176-77; Flowers at 235-36; Johnson at 371; Disanto at *5.

29

Distasio at 62. "The effect on the employee's psychological well-being is, of course, relevant to determining whether plaintiff actually found the environment abusive." Harris v. Forklift Systems, Inc., 510 U.S. 17, 23 (1993). Furthermore, "[t]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" Oncale v. Sundowner Offshore Sevices, Inc., 523 U.S. 75, 81 (1998).

In Whidbee v. Garzarelli Food Specialties, Inc., the Second Circuit Court of Appeals reversed summary judgment on a hostile environment claim cautioning that the bar should not be set too high:

> [T]he District Court held that [the employer's] conduct was not severe or pervasive because it did not render the plaintiffs' jobs "unendurable" or "intolerable." The bar is not set so high, however. While a mild, isolated incident does not make a work environment hostile, the test is whether "the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment *altered for the worse*." Torres v. Pisano, 116 F.3d 625, 632 (2d Cir.) (emphasis added), *cert. denied*, 522 U.S. 997 . . . (1997). "The fact that the law requires harassment to be severe or pervasive before it can be actionable does not mean that employers are free from liability in all but the most egregious of cases." *Id.* at 631; *cf.* Harris v. Forklift Sys., Inc., 510 U.S. 17, 22 . . . (1993) (employee's psychological well-being need not be affected in order to find a hostile work environment).

Whidbee, 223 F.3d 62, 70 (2d Cir.2000).

The evidence in this case, as set forth in plaintiff's Statement of Facts, supports that plaintiff was subjected to months of abusive comments and harassment by her coworkers, including what ACMI management itself characterized as "antagonizing" behavior, because of her emotional disabilities – *i.e.*, because certain of her coworkers found her to be moody and difficult to get along with. *Inter alia*, plaintiff was required to attend a meeting during which her coworkers chastised her for her moodiness and told her they thought she was looking for

30

attention and that she should get over it, reducing plaintiff to tears, intentionally bumped by her coworkers, and was glared at in an intimidating manner and physically threatened by King when he tried to run her car off the road as she was driving home from work. Rather than correct the abusive work environment, plaintiff's supervisors told her to ignore her coworkers' harassment, that the more she complained, the more they would harass her, and that she should take a leave of absence, blaming plaintiff and/or her emotional condition for the problems she was experiencing at work. Furthermore, despite knowledge that plaintiff was emotionally unstable, being harassed by her coworkers and having difficulty functioning in the workplace, plaintiff's supervisors issued documentary "counseling" to plaintiff, posted her name on the top of a list of poor performers causing plaintiff's coworkers to laugh at her, and then, callously and with deliberate disregard for plaintiff's emotional well-being, conditioned plaintiff's ability to be promoted to 1st Class on the requirement that she agree to be trained by King, of whom they knew she was terrified.

In addition to the overwhelming evidence supporting an objectively hostile environment, the evidence in this case establishes that plaintiff subjectively perceived the work environment as hostile. As stated, plaintiff's treating psychiatrist, Dr. Mueller, indicates in his report that "[plaintiff's] depressive symptoms dramatically increased after [the training by King] began. She also developed new symptoms, which include severe panic, agoraphobia, and fears of the workplace, intrusive dreams, nightmares, a startle response and clear flashbacks. These symptoms socially paralyzed her and led to severe chronic disability." Ex. 17. In his opinion, "[plaintiff] suffers from a profound depression and posttraumatic [stress] disorder that has left her permanently disable[d]" as a result of "her traumas of her former employment." Id. See also

31

Ex. 14 (Mueller) at 128-29. Plaintiff's family physician, Dr. Falkoff, also holds the opinion that the events at work were so traumatic to plaintiff that she is permanently disabled and unable to return to work. See Ex. 15 (Falkoff) at 129-30; Ex. 18.

Under these circumstances, whether the harassment was sufficiently severe or pervasive to constitute actionable harassment presents a question of fact that must be resolved at trial. See e.g., Henderson v. Simmons Foods, Inc., 217 F.3d 612, 617 (8th Cir.2000) (upholding judgment in favor of employee that employer subjected her to a hostile work environment in violation of Title VII where, *inter alia*, management required employee to work on a production line a few feet away from male employee who had sexually harassed her in past); Pollard v. E.I. DuPont de Nemours Company, 213 F.3d 933, 937-43 (6th Cir.2000), *reversed on issue of front pay only*, 532 U.S. 843 (2001) (upholding employer liability for hostile work environment under Title VII based on evidence, *inter alia*, that plaintiff was subjected to abusive comments and "believed [male coworker] tried to run her off the road as she left the plant," where plaintiff complained to management that she was afraid for her safety, but management failed to investigate her complaints or take any action to remedy the situation, leading trial court to conclude that it was "'a case of wretched indifference to an employee who was slowly drowning in an environment that was completely unacceptable, while her employer sat back and watched.'"); Norman v. University of Pittsburgh, 2002 WL 32194730, *13 (W.D.Pa., Sept. 17, 2002, Ambrose, J.) (finding genuine issue of fact concerning whether custodian who suffered from depression, anxiety and panic disorders was subjected to hostile work environment under ADA where, *inter alia*, plaintiff's coworkers told her she should "'go home and have a couple of beers' to relieve her anxiety" and administration told her she "just had to do" an assignment which included her

32

"greatest phobia – cleaning laboratories," due to a prior injury she suffered while cleaning a laboratory); Rooney v. Capital District Transportation Authority, 109 F.Supp.2d 86, 94-95 (N.D.N.Y. 2000) (summary judgment denied on issue of whether employee was subjected to hostile work environment under Title VII where plaintiff was subjected to unwanted touching on one occasion, comments and intimidation, and, although she requested separation from her harasser, was required to continue working in close proximity to him). Contrast Shaver v. Independent Stave Company, 350 F.3d 716, 722 (8th Cir.2003) (upholding summary judgment in favor of employer on issue of whether disabled employee was subjected to hostile work environment in violation of ADA noting "there is no allegation or evidence in this case to suggest that any of the harassment of [plaintiff] was explicitly or implicitly threatening" or "harassing conduct of a physical nature").[19]

### i.   *Defendant is liable for the hostile work environment.*

Defendant argues that it cannot be held liable for the hostile work environment, claiming that "there is no evidence that plaintiff complained to management, or that ACMI management had or should have had knowledge of the harassment and failed to take reasonable steps to address the situation." Def.Mem. at 16. Contrary to defendant's argument, the evidence

---

[19]   Defendant also argues that the "vast majority of the alleged comments that plaintiff claims constituted harassment of her were plainly unrelated to her mental condition." Def.Mem. at 15. Plaintiff disputes this claim, as set forth, supra, at Sections II and III.B.1.b.. Furthermore, "[i]t is not necessary that the harassing words or conduct refer specifically to the plaintiff's [disability]" provided the "factual circumstances [] permit the inference that plaintiff was subjected to a hostile work environment because of her [disability]." Thompson v. New York City Department of Probation, 2003 WL 22953165, *4-5 (S.D.N.Y., Dec. 12, 2003, Francis, J.) (Citing Gregory v. Daly, 243 F.3d 687, 694 (2d Cir.2001)). It is reasonable to infer from the evidence in this case that plaintiff's coworkers harassed her because they were annoyed by her depressed state and/or knew she was mentally disabled and wanted to get a rise out of her and, furthermore, that her supervisors did not want to deal with her emotional difficulties and made her work environment intolerable in an effort to force her to resign.

33

supports employer liability under standards of strict liability, as set forth in Faragher v. City of Boca Raton, 524 U.S. 775, 807-808 (1998) and Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 765 (1998), and/or under a negligence theory because defendant failed to prevent and correct the hostile work environment in this case.

An employer is subject to liability for a hostile work environment created by a coworker if it "failed to provide an adequate avenue for complaints" or "knew of the harassment, or in the exercise of reasonable care should have known, yet failed to take appropriate remedial action." Dobrich v. General Dynamics Corp., 106 F.Supp.2d 386, 392 (D.Conn. 2000).[20] Furthermore,

> an employer need not have actual knowledge of the harassment; an employer is considered to have notice of [] harassment if the employer – or any of its agents or supervisory employees – knew or should have known of the conduct. The question of when an official's actual or constructive knowledge will be imputed to the employer is determined by agency principles. An official's knowledge will be imputed to an employer when: (A) the official is at a sufficiently high level in the company's management hierarchy to qualify as a proxy for the company; or (B) the official is charged with a duty to act on the knowledge and stop the harassment; or (C) the official is charged with a duty to inform the company of the harassment.

Distasio v. Perkin Elmer Corporation, 157 F.3d 55, 63-64 (2d Cir.1998). See also Dobrich v. General Dynamics Corp., 106 F.Supp.2d 386, 392 (D.Conn. 2000) ("The Second Circuit has held that knowledge of the harassment may include constructive notice (*i.e.*, that management should have known.)").

"Once an employer has knowledge of a [discriminatory] atmosphere in the workplace, he

---

[20] As set forth supra at n.18, courts apply the same standards to claims for hostile work environment under Title VII and the ADA, including the standards for liability. See Silk v. City of Chicago, 194 F.3d 788, 804-5 (7th Cir.1999) (applying Title VII standards for liability to ADA hostile work environment claim); Disanto v. McGraw-Hill, Inc./Platt's Division, 1998 WL 474136, *5 (S.D.N.Y., Aug. 11, 1998, Koeltl, J.) (same); Vendetta v. Bell Atlantic Corporation, 1998 WL 575111, *9 (E.D.Pa., Sept. 8, 1998, Buckwalter, J.) (same).

34

has a duty to take reasonable steps to eliminate it." Snell v. Suffolk County, 782 F.2d 1094, 1104 (2d Cir.1986). See also Dortz v. City of New York, 904 F.Supp. 127, 153 (S.D.N.Y. 1995) (employer "has an obligation to investigate whether acts conducive to the creation of an atmosphere of hostility did in fact occur and, if so, it must attempt to dispel the workplace hostility by taking prompt remedial steps.") (Citation and quotations omitted); Watts v. New York City Police Department, 724 F.Supp. 99, 107-108 (S.D.N.Y. 1989) ("once an employer learns of claims of discriminatory acts, it cannot rest idly on the hopes that such acts will not be repeated . . . Title VII simply does not permit an employer to 'stand by and allow an employee to be subjected to a course of [] harassment . . . by co-workers.'").

In Ellerth and Faragher, the United States Supreme Court held that employers are subject to strict liability for a hostile work environment created by a supervisor, subject to an affirmative defense, as follows:

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over an employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, see Fed. Rule Civ. Proc. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any [] harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. While proof that an employer had promulgated an antiharassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense. And while proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by an employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense. No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.

35

Faragher v. City of Boca Raton, 524 U.S. 775, 807-808 (1998); Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 765 (1998).

It is well-established that defendant bears the burden of proving the Ellerth/Faragher affirmative defense. See Pennsylvania State Police v. Suders, — U.S. —, 124 S.Ct. 2342, 2354 (2004); Leopold v. Baccarat, Inc., 239 F.3d 243, 245 (2d Cir.2001).

***Defendant is not entitled to the Ellerth/Faragher affirmative defense in this case.***

Under Ellerth and Faragher, "[n]o affirmative defense is available [] when the supervisor's harassment culminates in a tangible employment action." Faragher at 808; Ellerth at 765. "'Tangible employment action' refers to 'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" Leopold v. Baccarat, Inc., 239 F.3d 243, 245 n.1 (2d Cir.2001) (quoting Ellerth at 761). See Wilburn v. Fleet Financial Group, Inc., 170 F.Supp.2d 219, 227 (D.Conn. 2001) ("Generally, a tangible employment action occurs where a supervisor acts with the employer's authority and makes a decision that 'inflicts direct economic harm' on the employee and 'constitutes a significant change in employment status, such as . . . failing to promote, . . . or a decision causing a significant change in benefits.'"); Armstrong v. Chrysler Financial Corp, 1999 WL 608831, *6 (D.Conn., July 29, 1999, Nevas, J.) ("deprivation of a position or an opportunity" constitutes tangible employment action).

The United States Supreme Court held, in Pennsylvania State Police v. Suders, that "an employer does *not* have recourse to the *Ellerth/Faragher* affirmative defense when a supervisor's official act precipitates [a] constructive discharge." Suders, — U.S. —, 124 S.Ct. 2342, 2351 (2004). In order to establish a hostile environment-constructive discharge, a plaintiff must show

36

not only harassment "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment," but also that the "working conditions were so intolerable that a reasonable person would have felt compelled to resign." Id. at 2354 (quotations omitted).

As set forth in Section III.B.3., *infra*, the evidence in this case establishes that, or at the very least creates a factual issue concerning whether, plaintiff was constructively discharged. Therefore, defendant is not entitled to the Ellerth/Faragher affirmative defense and is subject to strict liability for the hostile work environment in this case.

### *Defendant cannot establish the Ellerth/Faragher affirmative defense as a matter of law and/or is liable for coworker harassment in this case.*

Even assuming *arguendo* that plaintiff did not suffer any tangible employment action, defendant is liable for supervisory harassment in this case because it cannot establish as a matter of law the two necessary elements of the Ellerth/Faragher affirmative defense – *i.e.*, "that [it] exercised reasonable care to prevent and correct promptly [the] harassing behavior" and "that [plaintiff] unreasonably failed to take advantage of any preventive or corrective opportunities provided by [ACMI] or to avoid harm otherwise." Faragher at 807; Ellerth at 765. Furthermore, defendant is liable for coworker harassment in any event because it "failed to provide an adequate avenue for complaints" or "knew of the harassment, or in the exercise of reasonable care should have known, yet failed to take appropriate remedial action." Dobrich v. General Dynamics Corp., 106 F.Supp.2d 386, 392 (D.Conn. 2000).

As stated previously, the evidence in this case establishes that plaintiff complained to management about the harassment to which she was subjected by her coworkers and,

37

furthermore, that management had direct knowledge of the harassment on several occasions. Management took little or no action to stop the harassment, but rather told plaintiff to ignore the misconduct and that the more she complained about her coworkers' behavior, the more they would continue to harass her, and, in particular, completely disregarded plaintiff's report that King had engaged in threatening behavior toward her, requiring plaintiff to continue working near King and then that she be trained by King as if nothing had happened.[21]

Several courts have found evidence sufficient to support that an employer's response was inadequate under circumstances similar to those presented here. See e.g., Pollard v. E.I. DuPont de Nemours Company, 213 F.3d 933, 942-43 (6th Cir.2000), *reversed on issue of front pay only*, 532 U.S. 843 (2001) (employer liability for harassment of female employee upheld where evidence supported that plaintiff complained about the harassment and management had direct knowledge of harassing incidents, but that management conducted only cursory investigation, failed to discipline coworkers, "allowed the situation to fester without definitive action" and told plaintiff that if she returned to work she would be assigned to the same shift under the same circumstances); Ogden v. Wax Works, Inc., 214 F.3d 999, 1007 (8th Cir.2000) (determination that employer response was inadequate upheld where evidence supported, *inter alia*, that management "minimized" plaintiff's complaints and performed only cursory investigation of harassment which focused on plaintiff's performance rather than harasser's conduct); Baty v.

---

[21] The fact that defendant failed to exercise reasonable care to prevent the harassment in this case is also evidenced by the fact that defendant seemingly had no written policy prohibiting discrimination on the basis of disabilities and/or directing employees where to report such harassment while plaintiff was working at ACMI. Defendant failed to produce any such policy in response to plaintiff's discovery requests, but rather, produced policies that were enacted and/or posted at later dates. See Ex. 8 (Opalenik) at 28-30.

38

Willamette Industries, 172 F.3d 1232, 1242 (10th Cir.1999), *overruled on other grounds by* Nat'l Railroad Passenger Corp. v. Morgan, 536 U.S. 101 (2002) (evidence sufficient that employer response inadequate where "plaintiff presented evidence of defendant's lackadaisical attitude towards the harassment occurring within its walls, indicating that management condoned and even encouraged the creation of a hostile work environment for plaintiff, especially given plaintiff's complaints about harassment by her supervisors").

Even where the evidence supports that the employer took action greater than that taken by ACMI in this case, such as where the employer performed an investigation and/or disciplined the harasser, courts have found the employer's response inadequate. See e.g., Henderson v. Simmons Foods, Inc., 217 F.3d 612, 616-17 (8th Cir.2000) (employer liability for coworker harassment upheld where employer took no action when employee initially complained about harassment, transferred harasser to another shift for approximately 18 months, but then reassigned him to work a few feet away from plaintiff and when harassment resumed, conducted investigation and threatened to terminate harasser, but failed to stop the harassment); Riedinger v. D'Amicantino, 974 F.Supp. 322, 328 (S.D.N.Y. 1997) (even though employer took some action to investigate harassment, court found "adequate basis for a jury to reasonably conclude that the defendants either provided no reasonable avenue for complaint or that they knew about the discrimination to which plaintiff was subjected and acted inadequately to alleviate it" where employer waited four months after initial complaint to investigate, failed to question possible witnesses to the harassment, and failed to subject perpetrator to any discipline for his behavior); Dortz v. City of New York, 904 F.Supp. 127, 153-55 (S.D.N.Y. 1995) (even though employer performed investigation of harassment, court denied summary judgment on issue of whether

39

employer's response was reasonable based on evidence, *inter alia*, that: 1) the employer did not formally investigate the matter until 3 months after it had notice of the misconduct when plaintiff filed a formal charge with the EEOC, 2) the allegations were not adequately investigated prior to that time even though plaintiff's supervisor met with staff members about the allegations and spoke with the harasser, 3) the "remedial action" the employer did take failed to stop the harassment, and 4) the employer did not evidence plaintiff's complaint in the harasser's personnel file or inform plaintiff that any disciplinary action would be taken, thus suggesting to plaintiff that her allegations had not been credited, noting that "an employee in Plaintiff's position might have been left feeling as though she were responsible for the poor working environment.").

Thus, defendant cannot establish as a matter of law that it is entitled to the Ellerth/Faragher affirmative defense – *i.e.*, that management acted reasonably to prevent and correct promptly the harassment in this case and that plaintiff failed to take advantage of preventive or corrective opportunities available to her or to avoid harm otherwise. Furthermore, the evidence establishes that ACMI "failed to provide an adequate avenue for complaints" and/or "knew of the harassment, or in the exercise of reasonable care should have known, yet failed to take appropriate remedial action." Dobrich v. General Dynamics, 106 F.Supp.2d 386, 392 (D.Conn. 2000). Thus, defendant is not entitled to summary judgment on the issue of liability for the hostile work environment in this case. See id. at 394 ("The promptness and adequacy of an employer's response is generally a question of fact for the jury."); Dortz at 153 (whether employer "did or did not take prompt and effective remedial action . . . is a question properly left for trial.").

40

### 2. Plaintiff was retaliated against for complaining about her coworkers' misconduct.

The ADA prohibits retaliation against an employee because she has asserted rights under the ADA. See 42 U.S.C. §12203(a); Sarno v. Douglas Elliman-Gibbons & Ives, Inc., 183 F.3d 155, 159 (2d Cir.1999). In order to establish a *prima facie* case of retaliation under the ADA, plaintiff must show that:

> (1) [she] was engaged in an activity protected by the ADA, (2) [ACMI] was aware of that activity, (3) an employment action adverse to the plaintiff occurred, and (4) there existed a causal connection between the protected activity and the adverse employment action.

Sarno at 159.

Defendant moves for summary judgment on plaintiff's retaliation claim, claiming that plaintiff did not complain to ACMI that "she was being harassed or discriminated against because of her condition," suggesting that plaintiff was, therefore, not engaged in "protected activity." See Def.Mem. at 24. The evidence in this case, as set forth previously, establishes that plaintiff complained about, and that ACMI management had direct knowledge of, disability-based harassment, and, furthermore, that Scaglia told plaintiff she should stop complaining about the misconduct because it would only make her coworkers harass her more. See Sections II and III.B.1.b.. Thus, defendant's suggestion that plaintiff was not engaged in protected activity is without merit.

Defendant also argues that plaintiff was not subjected to "adverse employment action," citing to disputed facts in support. See Def.Mem. at 24-26. Contrary to defendant's claim, the evidence establishes that plaintiff was subjected to adverse employment action in retaliation for her complaints about her coworkers' misconduct in this case.

41

A plaintiff suffers "adverse employment action" if she "endures a materially adverse change in the terms and conditions of employment.'" Id. at 446 (quotations omitted). "Because there are no bright-line rules as to which employment actions meet the threshold for 'adverse,' courts must make this determination on a case-by-case basis." Wilburn v. Fleet Financial Group, Inc., 170 F.Supp.2d 219, 237 (D.Conn. 2001) (citing Richardson at 446). Furthermore, it is well established in the Second Circuit that plaintiff may prove the "adverse employment action" part of her *prima facie* retaliation case by establishing that she was subjected to a hostile work environment or reprisals for asserting her rights under the ADA. See Richardson v. New York Dept. of Correctional Service, 180 F.3d 426, 445-446 (2d Cir.1999) (unchecked coworker retaliatory harassment constitutes valid basis for retaliation claim). See also Gunnell v. Utah Valley State College, 152 F.3d 1253, 1264-65 (10th Cir.1998) (employer liable for retaliation where supervisory personnel either orchestrated, condoned or encouraged retaliatory harassment of plaintiff).

Here, management took no action in response to plaintiff's complaints and rather instructed plaintiff to ignore her coworkers' misconduct and that the more she complained, the more they would harass her, indicating that management tolerated or even condoned the misconduct. As a result, plaintiff's coworkers continued to abuse plaintiff and, in retaliation for plaintiff's complaints, engaged in more intimidating behavior including when King tried to run plaintiff's car off the road. See Richardson at 446 ("An employer subjects an employee to a materially adverse change in the terms and conditions of her employment if it "knew about but failed to take action to abate retaliatory harassment inflicted by co-workers."). See also Ericson v. City of Meriden, 205 F.R.D. 75, 79 (D.Conn. 2001); Knox v. State of Indiana, 93 F.3d 1327,

1334 (7th Cir.1996) (recognizing that "permitting [plaintiff's] fellow employees to punish her for invoking her rights under Title VII" constitutes a form of retaliation). Furthermore, management retaliated against plaintiff for complaining about her coworkers' misconduct, including when plaintiff's supervisors "counseled" plaintiff for her poor work performance and posted her name on the top of a list of poor performers in the department and, in particular, when her supervisors required that she be trained by King of whom they knew she was terrified and despite the fact that King was a 2nd Class Medical Instrument Maker, like plaintiff, and standard procedure called for plaintiff to be assigned to a 1st Class Medical Instrument Maker when training for a 1st Class position. See Ex. 1 (Schroeder) at 128-29 (Scaglia or Hill told her "if you want to be first class, you're going to have to train with Fred. That's the way it's got to be."); Ex. 5 (Hill) at 42-43 ("[Scaglia] told me that they wanted [King] to teach her because he was the best at the job, and they were – [plaintiff is] asking to work with [King], and [Scaglia] wanted to make sure that there was not going to be any conflict."); Ex. 3 (Gerace) at 15 (management refused to reassign plaintiff "adamant that [plaintiff] needed to get along with her co-workers."). Finally, as set forth at Section III.B.3., *infra*, the evidence establishes that plaintiff suffered an adverse employment action in that she was constructively discharged. See Fitzgerald v. Henderson, 251 F.3d 345, 357 (2d Cir.2001) (adverse employment actions include discharge from employment whether by actual termination of employment by the employer or "constructive discharge"); Wilburn at 238, n.49 (constructive discharge qualifies as adverse employment action); Downing v. West Haven Board of Ed., 162 F.Supp.2d 19, 29 (D.Conn. 2001) (same).

Thus, as set forth above, defendant is not entitled to summary judgment on plaintiff's retaliation claim.

### 3. Plaintiff was subjected to constructive discharge.

Defendant also moves for summary judgment on plaintiff's constructive discharge claim on the basis that the evidence does not support such a claim as a matter of law, once again citing to disputed issues of material fact in support of its argument. See Def.Mem. at 21-22. Contrary to defendant's argument, as set forth below, the evidence in this case supports that plaintiff's supervisors intentionally made her work environment intolerable and that plaintiff was constructively discharged as a result.

"An employee is constructively discharged when his employer, rather than discharging him directly, intentionally creates a work atmosphere so intolerable that he is forced to quit involuntarily." Petrosino v. Bell Atlantic, 385 F.3d 210, 229 (2d Cir.2004) (quotations omitted). "Case law generally focuses on two parts of this standard: the employer's intentional conduct and the intolerable level of the work conditions." Id. In reviewing a claim for constructive discharge, "[t]he conditions are judged from the perspective of a reasonable person in plaintiff's position." Colter v. Yale University, 2000 WL 559023, *3 (D.Conn., Mar. 24, 2000, Chatigny, J.). See also Petrosino at 230. Furthermore, as with evidence of a hostile work environment, evidence in support of a claim for constructive discharge must be viewed as a whole. See Chertkova v. Connecticut General Life Insurance Co., 92 F.3d 81, 90 (2d Cir.1996). While certain factors standing alone may be legally insufficient to demonstrate a constructive discharge,

> the effect of a number of adverse actions in the workplace is cumulative. A constructive discharge occurs if a reasonable person subjected to the same conditions as plaintiff would have felt compelled to step down.

Id. (holding that "[b]ecause a reasonable person encounters life's circumstances cumulatively and not individually, it was error [for the district court] to treat the various conditions as separate and

44

distinct rather than additive" in reversing summary judgment).

Here, management knew that plaintiff was suffering from mental disabilities following the death of her mother and was emotionally unstable, but allowed her to be subjected to months of abusive comments and intimidating behavior by her coworkers and, after plaintiff reported that King tried to run her car off the road and that she was terrified of him, forced plaintiff to continue working near him as if nothing had happened. Then, in deliberate cruelty, plaintiff's supervisors required plaintiff to be trained by King if she wanted a promotion to 1st Class, which, according to Dr. Mueller:

> began disorganizing [plaintiff] and causing severe episodes of agitation. These episodes escalated further to the point where she became incapable of working and eventually had to go out on disability. . . .
>
> [Plaintiff's] depressive symptoms dramatically increased after [the training with King] began. She also developed new symptoms, which include severe panic, agoraphobia, and fears of the workplace, intrusive dreams, nightmares, a startle response and clear flashbacks. These symptoms socially paralyzed her and led to severe chronic disability.

Ex. 17. Thus, plaintiff's emotional condition completely disintegrated as a result of the hostile work environment and/or retaliation to which she was subjected at ACMI and she became totally disabled from work. See id.

Under these circumstances, whether plaintiff was constructively discharged cannot be determined as a matter of law. See Henderson v. Simmons Foods, Inc., 217 F.3d 612, (8th Cir.2000) (upholding judgment in favor of employee on constructive discharge claim where, *inter alia*, management failed to respond to employee's complaints about hostile work environment, conducted only poor investigation of alleged incidents, and then forced plaintiff to work on production line within a few feet of harasser); Norman v. University of Pittsburgh, 2002

WL 32194730, *10-12 (W.D.Pa., Sept. 17, 2002, Ambrose, J.) (summary judgment denied on issue of whether employee who suffered from depression, anxiety and panic disorders was constructively discharged where, *inter alia*, plaintiff's coworkers told her she should "'go home and have a couple of beers' to relieve her anxiety" and management told her she "'just had to do' a workload she perceived as unequal which included her greatest phobia – cleaning laboratories" – due to a prior injury she suffered while cleaning a laboratory). See also Van Steenburgh v. Rival Company, 171 F.3d 1155, 1160 (8th Cir.1999) (evidence was sufficient to establish constructive discharge where employer failed to remedy harassment despite repeated complaints indicating that plaintiff had a "lack of recourse against the harassment within [the company's] organization."); Kimzey v. Wal-Mart Stores, Inc., 107 F.3d 568, 574-75 (8th Cir.1997) ("reasonable jury could find that the continuing harassment and management's indifference rendered [plaintiff's] working conditions intolerable and forced her to quit" even where management offered plaintiff other positions at exit interview because management "made no suggestion that [it] would investigate her complaints or try to ameliorate the situation or consider disciplinary action."). Contrast McPherson v. City of Waukegan, 379 F.3d 430, 440-41 (7th Cir.2004) (determination that employee was not constructively discharged as a matter of law upheld where employee's harasser was terminated months before employee chose to resign, City wrote letter to employee encouraging her to return to work, offering her additional discretionary leave if she needed more time before returning to work, and informing her that since harasser had previously resigned, she "need not fear that her return to work for the City would mean a return to a sexually harassing work environment."); Luciano v. Coca-Cola Enterprises, Inc., 2004 WL 1922137, *2 (D.Mass, Aug. 30, 2004, Stearns, J.) (employee not constructively discharged as a