matter of law where employee was "performing successfully" and failed to show how alleged harassing incidents, "singly or collectively, created such an inability to perform her job that resignation was her only plausible choice.").

Thus, defendant's motion for summary judgment on the issue of whether plaintiff was constructively discharged must be denied.

4.    **Plaintiff's claims are not barred by her application for and receipt of Social Security disability insurance benefits.**

Defendant also argues that plaintiff's claims relating to conduct occurring in or after December 2001 are barred because plaintiff applied for and is receiving Social Security disability insurance benefits based on representations that she is currently and has been unable to work since December 7, 2001, the date when she left work at ACMI, having been constructively discharged. See Def.Mem. at 23-24.[22] Defendant claims that plaintiff is, therefore, not a "qualified individual with a disability" protected by the ADA as of December 2001 and could not be retaliated against or constructively discharged in or after December 2001 as a matter of law. See id. Defendant's argument is disingenuous.

First, as recognized by defendant, the Supreme Court held, in <u>Cleveland v. Policy</u>

---

[22]    Plaintiff stated in her appeal of the denial of her application for SSDI benefits, that she:

> . . . has not been able to work since December 2001 when she suffered a dramatic deterioration in her emotional status after she was forced to train with a coworker who had previously threatened her safety and of whom she was extremely fearful.

Ex. 19 (Bates #314). Plaintiff's initial application for benefits, filed in March 2002, states that she became unable to work on December 7, 2001, that she stopped working because she was having suffering from depression and was having "panic attacks, could not focus on work," and was "fearful around [her] coworkers," and that she was having problems with her coworkers and was nervous and anxious about her bosses. See id. (Bates #547-548, 566).

Management Systems Corporation, 526 U.S. 795 (1999), that "pursuit, and receipt, of SSDI

benefits does not automatically estop the recipient from pursuing an ADA claim" because the

"two seemingly divergent statutory contentions are often consistent, each with the other." Id. at

797. In order to survive summary judgment, a plaintiff only needs to explain "any apparent

inconsistency with the necessary elements of an ADA claim." Id. at 807.

> To defeat summary judgment, that explanation must be sufficient to warrant a reasonable
> juror's concluding that, assuming the truth of, or the plaintiff's good faith belief in, the
> earlier statement, the plaintiff could nonetheless "perform the essential functions" of her
> job, with or without "reasonable accommodation."

Id.

Plaintiff's positions are not inconsistent in this case. Plaintiff claims that she was a

"qualified individual" *at the time* she was working at ACMI in that she was able to and would

have continued to perform the essential functions of her job at ACMI had management provided

her with reasonable accommodations and/or stopped the hostile and abusive working

environment to which she was subjected at ACMI. A plaintiff's claim for SSDI benefits

representing that she is totally disabled from work is not inconsistent with a claim that her

employer violated the ADA by failing to provide her reasonable accommodation that would have

allowed her to continue working because applications for SSDI do not take into account an

employee's ability to perform a job with accommodation. See e.g., Giles v. General Electric

Company, 245 F.3d 474, 485 (5th Cir.2001) (employee's representations in applications for long

term disability and SSDI benefits not inconsistent with claim under ADA because the

applications did not take into account plaintiff's ability to perform his job with reasonable

accommodation).

Because defendant failed to provide reasonable accommodations to plaintiff and because plaintiff was subjected to a hostile work environment and retaliated against while working at ACMI and, in particular, because her supervisors required that she be trained by King, plaintiff's emotional condition completely disintegrated in December 2001 and she was forced to leave work, having been constructively discharged. See Sections III.B.1., 2. and 3., *supra*. Therefore, as a result of defendant's actions and/or failure to act, plaintiff became totally disabled from work in December 2001 and continues to be totally disabled as of this time. See Exs. 17 and 18.

The fact that plaintiff has become totally disabled as a result of the circumstances at work does not defeat her claim under the ADA. In Kennelly v. Pennsylvania Turnpike Commission, the plaintiff was hired by defendant as an emergency response worker, but suffered a "debilitating emotional breakdown" one week later "when he allegedly was told by his employer that he was going to be assigned to emergency response work on his own without any further training." Id. at 513. Plaintiff had requested additional training and had expressed concern to management about working alone because he did not believe that he had the proper and necessary medical training to operate the emergency medical equipment at that time; nonetheless, management informed him that he would be working alone beginning the following week. See id. at 507-8. Plaintiff, who suffered from a panic disorder, became "increasingly anxious about his ability to do the job," "his anxieties were heightened by the insensitivity shown by the Commission management to his inquiries regarding training," and, as a result, plaintiff's emotional condition completely disintegrated and he became totally disabled from work. See id. at 509. The Commission also denied plaintiff's request, through his treating psychiatrist, for a "less stressful" position. See id.

The court held that genuine issues of material fact existed concerning whether plaintiff could have performed the job with reasonable accommodation and whether the Commission engaged in good faith in an interactive process with plaintiff to determine whether accommodations were feasible.  See id. at 513.  Furthermore, the court held that plaintiff's ADA claim was not barred by the fact that he was then totally disabled from work because an issue of material fact existed as to whether plaintiff was qualified for the job, but became unqualified as a result of defendant's actions.  See id.  See also Norman v. University of Pittsburgh, 2002 WL 32194730, *5-9 (W.D.Pa., Sept. 17, 2002, Ambrose, J.) (ADA claim not barred by current total disability because "determination of whether someone is a qualified individual with a disability . . . is made at the time of the adverse employment action" and, like the plaintiff in Kennelly, Norman suffered an emotional breakdown after defendant told her it would not provide her with accommodation and she just had to do the job;  "A reasonable jury could conclude that the change in her status from a qualified individual . . . to an individual who was totally disabled . . . was precipitated by Defendant's failure to accommodate her disability."); Harper v. Casey, 1998 WL 614768, * 5 (E.D.Pa., Sept. 14, 1998, Reed, J.) (plaintiff not estopped from claiming she was qualified for position at firm by representation in SSDI application that she is now totally disabled from work because she "alleges disability was caused by the conduct of [supervisor]; the defendants cannot shield themselves from liability behind a disability which [plaintiff] alleges was caused by the defendants.").  Likewise, plaintiff here should not be estopped from pursuing her ADA claim because she was a "qualified individual" under the ADA while working for ACMI and her current total disability *resulted* from defendant's conduct in violating the ADA.

Defendant does not cite any legal support for its argument that plaintiff's claims for

retaliation and constructive discharge are barred by plaintiff's representation in her application for SSDI benefits that she became totally disabled in December 2001. However, for the same reasons set forth above – *i.e.*, because plaintiff's claims are not inconsistent in this case, summary judgment must be denied on this issue.

### 5.    Plaintiff's state law claims are not barred by the timing of her CHRO filing.

Defendant argues that plaintiff's state law discrimination claims are barred because plaintiff's administrative complaint to the CHRO was untimely in that it was filed on July 2, 2002, more than 180 days after the alleged incidents of discrimination in her complaint took place, with the exception of the allegation that:

> In May 2002, when Ms. Schroeder's term of short term disability was coming to an end, ACMI contacted her to return to work on the night shift in the same work environment that had caused her to suffer an emotional breakdown in December 2001. Despite the fact that Ms. Schroeder had clearly communicated to management that she could not continue to work with the individuals on the night shift who frightened and harassed her, ACMI failed to offer Ms. Schroeder the accommodation she had requested of working on the day shift.

See Amended Complaint, ¶¶22, 26. Contrary to defendant's argument, plaintiff's state law discrimination claims are not barred because 1) plaintiff is entitled to equitable tolling and/or equitable estoppel of the limitations period for filing her CHRO complaint in this case, and 2) 1) plaintiff's complaint was timely under a continuing violations theory.

"'Equitable tolling allows courts to extend the statute of limitations beyond the time of expiration as necessary to avoid inequitable circumstances.'" Collazo v. Sikorsky Aircraft Corp., 2004 WL 1498130, *2 (D.Conn., June 23, 2004, Kravitz, J.) (Quoting Johnson v. Nyack Hosp.,

86 F.3d 8, 12 (2d Cir.1996)).[23] Equitable tolling is appropriate only in "'rare and exceptional circumstances, in which a party is prevented in some extraordinary way from exercising his rights'" including "'where a plaintiff's medical condition or mental impairment prevented her from proceeding in a timely fashion.'" Id. (Quoting Zerilli-Edelglass v. N.Y. City Transit Auth., 333 F.3d 74, 80-81 (2d Cir.2003)). "[T]he question of whether a person is sufficiently mentally disabled to justify tolling of a limitation period is, under the law of [the Second Circuit], highly case-specific." Boos v. Runyon, 201 F.3d 178, 184 (2d Cir.2000).

"The maxim underlying equitable estoppel is that no litigant may take advantage of his own wrong, so that where one party has by his representations or his conduct induced another party to a transaction to give him an advantage which it would be against equity and good conscience for him to assert, he would not in a court of justice be permitted to avail himself of that advantage." Kotec v. The Japanese Educational Institute of New York, 321 F.Supp.2d 428, 433 (D.Conn. 2004) (Quoting Glus v. Brooklyn E. Dist. Terminal, 359 U.S. 231 (1959) (Citation and quotations omitted).

Plaintiff is entitled to equitable tolling and/or equitable estoppel of the limitations period in this case. As stated previously, according to Dr. Mueller, as a result of the circumstances to which she was subjected at ACMI, plaintiff "suffers from a profound depression and posttraumatic [stress] disorder that has left her permanently disable[d]." Ex. 17. When plaintiff first contacted counsel on or about May 10, 2002, after receiving the denial of her application for

---

[23]    Equitable tolling of the limitations period for filing a complaint with the CHRO is permitted under Connecticut state law, as well. Connecticut courts "'often look[] to federal discrimination law for guidance in enforcing [Connecticut's] anti-discrimination statute.'" Williams v. CHRO, 257 Conn. 258, 278 (2001) (holding that 180-day time period for filing administrative complaint with CHRO is not subject matter jurisdictional, but rather is subject to waiver and equitable tolling).

SSDI benefits, she was "very fearful of anything that had to do with ACMI" and was afraid that if she pursued a claim against ACMI, there would be reprisals from ACMI employees. See Plaintiff's Aff., ¶3-4. Plaintiff spoke to her doctors and sister about the possibility of bringing a claim and they attempted to alleviate her fears, but plaintiff was emotionally incapable of making a decision to pursue a claim until June 12, 2002, when she finally retained counsel for that purpose. See id., ¶5. See also Ex. 14 (Mueller) at 43-44, 46, 50-51, 52-53 (testifying that his treatment notes for the first half of 2002 reflect, *inter alia*, that plaintiff was extremely fearful of returning to work at ACMI, that she was having flashbacks of the work environment, and, on May 14, 2002, after consulting with counsel, that she was "[v]ery anxious, very panicky," and "very fearful of reprisals from work."). Counsel for plaintiff filed plaintiff's administrative complaint with the CHRO on July 2, 2002, immediately after plaintiff signed the complaint and approximately 207 days after plaintiff left her employment at ACMI, having been constructively discharged. See Plaintiff's Aff., ¶7; Ex. 31.

Under these circumstances plaintiff is entitled to equitable tolling and/or equitable estoppel. See e.g., Stoll v. Runyon, 165 F.3d 1238, 1242 (9th Cir.1999) (equitable tolling of limitations period warranted where, *inter alia*, evidence supported that female employee was so mentally incapacitated as a result of severe sexual harassment that it affected her relationship with male attorney and left her unable to file timely complaint and because employer "is not entitled to benefit from the fact that its own admittedly outrageous acts left [plaintiff] so broken and damaged that she cannot protect her own rights"); Dougherty v. Henderson, 155 F.Supp.2d 269, 278-79 (E.D.Pa. 2001) (issue of material fact concerning whether plaintiff was disabled from asserting her legal rights as a result of sexual harassment). Contrast Boos at 185 (equitable

tolling on basis of mental disability denied where plaintiff stated nature of mental disabilities only "without a particularized description of how her condition adversely affected her capacity to function generally or in relationship to the pursuit of her rights").

Furthermore, plaintiff's CHRO complaint was timely because she was subjected to continuing discrimination. "To bring a claim with the continuing violations exception [to the limitations period for filing a claim], a plaintiff must at the very least allege that one act in furtherance of the ongoing policy [of discrimination] occurred within the limitations period." Patterson v. County of Oneida, New York, 375 F.3d 206, 220 (2004).[24] Here, the evidence supports that ACMI contacted plaintiff in May 2002 while she was out on disability leave to return to the same hostile work environment that had caused plaintiff's emotional breakdown. See Amended Complaint, ¶22. Just as it is reasonable to infer that ACMI management did not want to deal with plaintiff's emotional difficulties while she was working at ACMI and subjected her to intolerable working conditions so that she would be forced to leave, it is reasonable to infer that management did not really want plaintiff to return to work and, thus, offered her a return to work on the same shift under the same circumstances – i.e., the same hostile work environment – that existed previously. Thus, because the evidence supports an event of discrimination in May 2002, plaintiff's CHRO complaint was, in fact, timely.

Thus, defendant is not entitled to summary judgment on plaintiff's state law discrimination claims.

---

[24]     Connecticut law also recognizes continuing violations theory for purposes of determining whether a discrimination complaint is timely filed.  See State v. Comm. On Human Rights & Opportunities, 211 Conn. 464, 475 (1989).

C.    **DEFENDANT IS NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

1.    **Defendant's conduct was extreme and outrageous.**

Defendant argues that it is entitled to summary judgment on plaintiff's claim for intentional infliction of emotional distress [IIED] on the basis that the conduct at issue does not rise to a level that was "extreme and outrageous" as a matter of law. See Def.Mem. at 27-28.[25] Contrary to defendant's argument, the evidence in this case establishes extreme and outrageous behavior.

"Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court to determine." Appleton v. Board of Education of the Town of Stonington, 254 Conn. 205, 210 (2000). However, when reasonable minds may disagree as to whether particular conduct is extreme and outrageous, "it becomes an issue for the jury." Id.

Under Connecticut law, defendant's knowledge of plaintiff's vulnerability is relevant in assessing the extreme and outrageous character of the conduct:

> [T]he "extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity. The conduct may become heartless, flagrant, and outrageous when the actor proceeds in the face of such knowledge, where it would not be so if he did not know." 1 Restatement (Second) of Torts § 46 comment (f).

Mellaly v. Eastman Kodak Company, 42 Conn.Supp. 17, 20 (1991) (extreme and outrageous conduct found where employer harassed employee about his alcoholism) (emphasis added). See

---

[25]    Defendant does not argue that the evidence in this case is insufficient to establish the remainder of the elements required to establish a claim for IIED. See Def.Mem.

55

also Brown v. Ellis, 40 Conn.Supp. 165, 167 (1984) ("Mere insults, indignities or annoyances that are not extreme or outrageous will not suffice . . . Such conduct may, however, give rise to a cause of action where the defendant is aware of the peculiar sensitivities of the plaintiff.").

In Brown, the court found that intentional infliction of emotional distress claim was properly brought where the plaintiff, an employee who feared heights, claimed that his employer assigned him to perform his work at great heights. See id. at 167-68. See also Nguyen v. Newberry Industries, Inc., 1997 WL 746442, *5-6 (Conn.Super., Nov. 14, 1997, Hale, J.) (where employee informed employer of work related injury and employer refused to accommodate employee's request for reassignment that would not aggravate condition, reasonable minds could differ as to whether extreme and outrageous); Redding v. Liberty Bank, 1995 WL 320019, *6-7 (Conn.Super., May 22, 1995, Hendel, J.) (same); Settembri v. American Radio Relay League, 1992 WL 67568, *4 (Conn.Super., March 27, 1992, Schaller, J.) (where employer was aware that plaintiff was "peculiarly susceptible to emotional distress" due to total disability, yet ordered plaintiff to return to return to work or face termination, reasonable minds could differ as to whether extreme and outrageous).

Furthermore, where an employer takes adverse actions with retaliatory motive, whether the conduct is extreme and outrageous is a question for the jury. See Larsen v. Lynch, 1998 WL 229919, *7 (D.Conn., March 31, 1998, Thompson, J.) (summary judgment denied where plaintiff alleges that defendants took various adverse employment actions against plaintiff in retaliation for "assertiveness as union president"; "reasonable trier of fact could conclude that the defendants' various actions ... , taken cumulatively, constituted 'extreme and outrageous' conduct."); Preston v. Phelps Dodge Copper Products Co., 35 Conn.App. 850, 863 (1994) (court

upheld jury instruction where jury found employer's termination of employee in retaliation for making safety complaint extreme and outrageous); Talit v. Peterson, 44 Conn.Supp. 490, 498 (1995) (court denied motion to strike where defendants caused plaintiff to lose her job in retaliation for filing a grievance; "This 'alleged retaliatory conduct is that type of extreme and outrageous conduct which ... constitutes intentional infliction of emotional distress.' Class v. New Jersey Life Ins. Co., 746 F.Supp. 776, 778 (N.D.Ill. 1990.)"). See also Lapadula v. City of Middletown, 1994 WL 450329 (Conn.Super., Aug. 16, 1994, Gaffney, J.) (in an emotional distress case where "the inferences which the parties seek to have drawn deal with questions of motive, intent and subjective feelings and reactions," summary judgment is particularly inappropriate) (quoting Connell v. Colwell, 214 Conn. 242, 251 (1990)).

In addition, "evidence of physical contact such as offensive touching supports "extreme and outrageous" behavior in the context of the workplace under Connecticut law. See Cole v. Terrell Moorehouse, 2002 WL 31304178, *3 (Conn.Super., Sept. 18, 2002, Robinson-Thomas, J.) (noting that Connecticut courts "do not typically strike claims or grant judgments [on IIED claims] where physical contact has occurred" and denying summary judgment where evidence supported that plaintiff's supervisor, inter alia, grabbed plaintiff's hands from a door knob and snatched papers from plaintiff's hands in an intimidating manner).

The evidence in this case supports that defendant was aware that plaintiff was suffering from mental disabilities that made her especially susceptible to emotional distress, yet allowed her coworkers to harass and torment her over many months taking little or no action to stop the misconduct thus indicating to her coworkers that their behavior was tolerated or even condoned by management, and then required plaintiff to be trained by King even though they knew that he

57

had engaged in threatening behavior toward plaintiff and that she was extremely fearful of him. Furthermore, the evidence supports that management took these actions and others against plaintiff with a retaliatory motive. See Section III.B.2, *supra*.

Thus, the evidence in this case is more than sufficient to support a claim for intentional infliction of emotional distress under Connecticut state law, and defendant is not entitled to summary judgment. See also, e.g., Moysis v. DTG Datanet, 278 F.3d 819, 827-28 (8th Cir.2002) (upholding judgment in favor of employee on IIED claim under South Dakota state law where employer had knowledge of plaintiff's fragile emotional condition and strong desire to return to work following traumatic brain injury and months of rehabilitation, but terminated his employment and misrepresented to plaintiff that the reason was client and coworker complaints, an "area in which they knew [plaintiff] was vulnerable"); Pollard v. E.I. DuPont de Nemours Company, 213 F.3d 933,937-47 (6th Cir.2000), *reversed on issue of front pay only*, 532 U.S. 843 (2001) (reversing summary judgment in favor of employer on IIED claim under Tennessee state law where, *inter alia*, plaintiff was subjected to abusive comments and "believed [male coworker] tried to run her off the road as she left the plant," but management failed to investigate plaintiff's complaints or take any action to remedy the situation, leading trial court to conclude that it was "'a case of wretched indifference to an employee who was slowly drowning in an environment that was completely unacceptable, while her employer sat back and watched.'"); Peterson v. Sioux Valley Hospital Association, 486 N.W.2d 516, 519 (S.D. 1992) (summary judgment reversed on IIED claim under South Dakota state law where evidence supported that management, *inter alia*, called plaintiff into meeting with her coworkers and allowed them to confront her directly with their complaints about her despite knowledge of plaintiff's "fear of

58

confrontational group meetings").

### 2.    Plaintiff's claim is not barred for failure to exhaust grievance procedures.

Defendant also argues that it is entitled to summary judgment on plaintiff's IIED claim on the basis that she "failed to exhaust the grievance procedures mandated by her collective bargaining agreement." Def.Mem. at 28. Defendant does not cite to any federal authority in support of its argument, and its argument is incorrect.

"The Supreme Court has held that a state tort action arising out of the retaliatory discharge of an employee covered by a collective bargaining agreement is not preempted by section 301 of the Labor Management Relations Act and may be prosecuted without reference to the grievance procedure established by the agreement." Bak v. Berman Enterprises, Inc., 1992 WL 439045, *5 (E.D.N.Y., Dec. 24, 1992, Sifton, J.) (Citing Lingle v. Norge Division of Magic Chef, Inc., 486 U.S. 399 (1988)). Rather, "[a] state law claim is preempted only if the application of state law requires the interpretation of a collective bargaining agreement." Id. (Citing Lingle at 405-6 and holding that wrongful discharge claim was not preempted in that case because it was "independent" of and did not require interpretation of the collective bargaining agreement). See also Vorvis v. Southern New England Telephone Company, 821 F.Supp. 851, 854-55 (D.Conn. 1993) (state law tort claims related to mistreatment in the workplace, including claim for IIED, were not preempted by CBA because claims did not require court to construe CBA); Claps v. Moliterno Stone Sales, Inc., 819 F.Supp. 141, 149-54 (D.Conn. 1993) (where plaintiff's state law claims for wrongful discharge, retaliatory discharge and IIED did not require court to interpret terms of CBA and were not based on defendant's failure to follow procedures

in CBA, claims were not preempted by the LMRA). Here, plaintiff's claim for intentional

infliction of emotional distress does not require interpretation or consideration of any term of the

CBA and, therefore, is not preempted by the LMRA.

Furthermore, plaintiff was not required to exhaust her claim for IIED under the grievance

process under Connecticut state law. In <u>Mendillo v. Board of Education of the Town of East

Haddam</u>, 246 Conn. 456, (1998), the Connecticut Supreme Court held that the plaintiff teacher

was not required to exhaust the grievance procedures under her CBA before bringing state law

claim for constructive discharge based on evidence that she was subjected to an intolerable

hostile work environment by defendant because the dispute was not the type that the "termination

hearing" under the CBA was designed to resolve and, therefore, the process would have been

"futile or inadequate." <u>Mendillo</u> at 464-471. Furthermore, the court held that plaintiff was not

required to exhaust the grievance process with respect to her claim for IIED, also based on

evidence that she was subjected to a hostile work environment while employed by defendant,

because the CBA did not contain any provision that specifically covered the alleged tortious

conduct and there was no provision that would be "violated, misinterpreted or misapplied by [the

employer's] alleged tortious conduct," but rather the CBA covered "what one would normally

consider to be matters of compensation and conditions of employment." <u>Id.</u> at 474-76 ("It is not

true, however, notwithstanding the defendant's contrary suggestion that simply because the claim

alleged by plaintiff arose out of the employment relationship, the plaintiff was required to resort

to the grievance procedures of the [CBA] governing that relationship. Not every dispute that

arises out of an employment relationship constitutes a grievable matter.").

As in <u>Mendillo</u>, plaintiff's claim for IIED does not fall under the provisions of the CBA

in this case [see Def.Mem., Ex. B] and, furthermore, to pursue the grievance process would have been futile because plaintiff was already totally disabled from work as a result of defendant's actions at the time of her constructive discharge and the remedies required to redress plaintiff's injuries were not available under the CBA.  See also, e.g., Town of Greenwich v. Liquor Control Commission, 191 Conn. 528, 541 (1983) (plaintiffs were not required to pursue administrative process where to do so would have been futile because "[t]he law does not require the doing of a useless thing."); O'Halloran v. Charlotte Hungerford Hospital, 63 Conn.App. 460, 464-65 (2001) (physician was not required to exhaust grievance procedure prior to pursuing state law claims in court because plaintiff "challenged alleged tortious conduct on the part of the defendants unrelated to the reappointment process [under the bylaws]" and because the remedies sought by plaintiff including "damages caused by injury to his reputation and standing" were not available through the administrative process); Maresca v. Town of Ridgefield, 35 Conn.App. 769, 773 (1994) (former employee was not required to exhaust administrative remedies because only relief available to aggrieved employee was reinstatement and reinstatement would have been useless remedy to plaintiff, who was already re-employed); Charbonneau v. United Grinding, Inc., 1995 WL 748471, *3 (Conn.Super., Nov. 20, 1995, Arena, J.) (employee was not required to exhaust administrative remedies where relief was not available through administrative process).  See also Green v. Toburen, 2000 WL 894680, *2-3 (Conn.Super., June 20, 2000, Sequino, J.) (state law claims for injuries resulting from assault of plaintiff by supervisor, including claim for IIED, were not preempted by LMRA because they did not require interpretation of CBA and plaintiff was not required to exhaust grievance process because plaintiff was no longer working for defendant, his tort claims were not dependent on the employment agreement, and plaintiff was

61

not required to pursue an administrative remedy for liability and compensation for his injuries).

Thus, plaintiff was not required to pursue the grievance process in this case, and defendant is not entitled to summary judgment on plaintiff's claim for IIED on this basis.

## D.    DEFENDANT IS NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM FOR PUNITIVE DAMAGES

Finally, defendant claims that it is entitled to summary judgment on plaintiff's claim for punitive damages, arguing that plaintiff cannot establish that defendant acted with "malice or reckless indifference" to her federally protected rights as a matter of law. Summary judgment must be denied because a factual issue exists concerning whether defendant acted with "malice or reckless indifference" in this case.

A plaintiff in an ADA action may recover punitive damages if she can demonstrate that defendant "engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of [the] aggrieved individual." 42 U.S.C. §1981a; 42 U.S.C. §12117(a) (incorporating by reference remedial provisions available under Title VII).

> The Supreme Court emphasized in *Kolstad* that the statutory terms "'malice' and 'reckless' ultimately focus on the actor's state of mind." Although "egregious misconduct is evidence of the requisite mental state, §1981a does not limit plaintiffs to this form of evidence . . . "What is required is evidence that the employer "discriminate[d] in the face of a perceived risk that its actions [would] violate federal law." An employer would not have the requisite state of mind if he was "unaware of the relevant federal prohibition" or acted "with the distinct belief that its discrimination is lawful."

Zimmerman v. Associates of First Capital Corporation, 251 F.3d 376, 384 (2d Cir.2001) (citing and quoting Kolstad v. American Dental Ass'n, 527 U.S. 526, 529-30 (1999)) (citations and quotations partially omitted). See also Farias v. Instructional Systems, Inc., 259 F.3d 91, 101 (2d

Cir.2001) ("Malice and reckless indifference refer to 'the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination.'") (quoting Kolstad at 535).

Based on the evidence in this case including that defendant knew plaintiff was suffering from mental disabilities and that her coworkers were tormenting her, but failed to take any action to correct the situation and that plaintiff's supervisors knew King terrified plaintiff because he had engaged in threatening and intimidating behavior toward her, but nonetheless required plaintiff to be trained by him, it is reasonable to infer that ACMI management did not want to deal with plaintiff's emotional difficulties and the problems she was experiencing in the workplace and intentionally made her work environment unbearable so that plaintiff would be forced to resign.

Under these circumstances, whether defendant acted with malice or with reckless disregard for plaintiff's rights under the ADA and, therefore, whether plaintiff is entitled to punitive damages is a factual issue that cannot be decided on summary judgment. See Pavon v. Swift Transportation Co., Inc., 192 F.3d 902, 909 (9th Cir.1999) (upholding punitive damages award where defendant's management was aware of discriminatory conduct, but "took no meaningful steps to stop it" finding that the jury "could have concluded that [defendant] did not believe [plaintiff's] allegation and never seriously investigated the situation" or that "[defendant's] refusal to investigate stemmed from its blame-the-victim mentality, wherein it wrongfully perceived [plaintiff] as the problem, labeled him a troublemaker and terminated him."); Knowlton v. Teltrust Phones, Inc., 189 F.3d 1177, 1187 (10th Cir.1999) (reversing directed verdict and remanding for consideration of issue of punitive damages by jury where

63

evidence supported that defendant's management was aware of hostile work environment but was unresponsive to plaintiff's complaints).

## IV.    CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment must be denied.

THE PLAINTIFF, HEIDI E. SCHROEDER

BY:_____

KATHRYN EMMETT
Federal Bar No. ct05605
CHRISTINE CAULFIELD
Federal Bar No. ct19115
EMMETT & GLANDER
45 Franklin Street
Stamford, CT  06901
(203) 324-7744
kemmett@emmettandglander.com
ccaulfield@emmettandglander.com

64

## CERTIFICATION

This is to certify that a copy of the foregoing was mailed, postage prepaid, this 21st day of January, 2005, to:

James M. Sconzo, Esq.
Jonathan C. Sterling, Esq.
Halloran & Sage, LLP
One Goodwin Square, 225 Asylum Street
Hartford, CT  06103.4303

Kathryn Emmett

65