UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| HEIDI E. SCHROEDER, | : | CIVIL ACTION NO. |
| Plaintiff, | : | 3:03CV 0410 (DJS) |
| | : | |
| VS. | : | |
| | : | |
| ACMI CORPORATION, | : | |
| Defendant. | : | MARCH 18, 2005 |

**DEFENDANT'S REPLY MEMORANDUM OF LAW
IN FURTHER SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

## I.    Preliminary Statement

Defendant ACMI Corporation ("ACMI" or the "Company") submits this reply memorandum in support of its motion for summary judgment and in response to plaintiff's opposition papers (totaling over 63 pages in the Memorandum in Opposition to Summary Judgment, "Plaintiff's Memo," alone). To keep this case alive, plaintiff has thrown every conceivable "fact" into the kettle in an effort to avoid summary judgment. The truth is, however, that based on the undisputed facts of this case, plaintiff cannot even establish a prima facie case against the Company for harassment and discrimination –in both cases allegedly "because of" her disability.

As is shown below, as a matter of law (i) the undisputed incidents that plaintiff claims were harassment are not pervasive or severe enough to constitute actionable harassment and were not in response to any disability, and (ii) the undisputed facts establish that the Company never discriminated against plaintiff "because of" her disability, and in fact, plaintiff never even requested reasonable accommodation for her essential job functions, due to her disability.

Before proceeding to the merits, it is worth making one additional observation. The issue in this case is not whether one should be sympathetic to the plaintiff's current condition, or her worsening mental and emotional condition following the death of her mother. The issue in this case is that, as a matter of law, on the undisputed facts of this case, Federal and state employment discrimination laws **do not** impose any liability on the Company for the plaintiff's personal situation.

## <u>Summary Judgment is Appropriate In This Case.</u>

This Court has consistently held that summary judgment is appropriate in employment discrimination cases --like the present one-- where there is no dispute as to material facts, and where the movant is entitled to judgment as a matter of law. <u>See, e.g.</u>, <u>Charron v. City of Hartford</u>, --- F.Supp.2d ----, 2005 WL 395431 (D.Conn. 2005)(Summary judgment granted to employer in race and age discrimination case).[1]

In determining whether material facts are in genuine dispute, the Second Circuit has rejected precisely the type of speculation and doubt spread through the plaintiff's opposition papers. The Second Circuit has made clear that "an employment discrimination plaintiff faced with a properly supported summary judgment

---

[1]  Additional employment cases where this Court granted summary judgment to employers include: <u>Harvey v. Mark</u>, 352 F.Supp.2d 285 (D.Conn.2005) (Summary judgment granted in sex discrimination case); <u>Cioffi v. Allen Products Co.</u>, 2000 WL 33180448 (D.Conn.2000) (Summary judgment granted in hostile work environment, constructive discharge and retaliation case); <u>Cino v. Sikorsky Aircraft</u>, 42 F.Supp.2d 147 (D.Conn.1998) (Summary judgment granted in ADA case).

motion must 'do more than simply show that there is some metaphysical doubt as to the material facts.' She must come forth with evidence sufficient to allow a reasonable jury to find in her favor." Brown v. Henderson, 257 F.3d 246, 252 (2d Cir.2001). She may not rely "on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." Lipton v. The Nature Company, 71 F.3d 464, 469 (2d Cir.1995) (quoting Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir.1986)). Additionally, she may not rest on the "mere allegations or denials" contained in her pleadings. Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir.1995). Moreover, the "mere existence of a scintilla of evidence in support of [ ] plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for [ ] plaintiff." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505 (1986). "Even where an employer's intent is at issue, 'a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment.'" Alphonse v. State of Connecticut Dept. of Admin. Svcs., 2004 WL 904076, *4 (D.Conn. 2004) citing Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir.1997). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Alphonse at *4, quoting Andersen, 477 U.S. at 249-50.

The plaintiff's arguments in her Memo generally boil down to the following two overarching claims of employment discrimination: 1) that co-workers at the Company unlawfully harassed the plaintiff "because of" of her disability, and that the Company should be held vicariously liable for this conduct, and (2) that the Company unlawfully discriminated against the plaintiff, again "because of" her disability, by failing to provide her with any reasonable accommodation regarding her essential job functions. However, given the undisputed material facts in this case (including plaintiff's own admissions), she cannot prevail on either claim.

**A.     There was no hostile work environment directed at plaintiff's disability.**

These undisputed material facts and admissions establish that there was not an actionable hostile work environment resulting from harassment by co-workers arising from plaintiff's disability:

- Plaintiff admits that she has no evidence that she tied her allegedly harassing treatment by her co-workers to her disability when she complained to her supervisor. (Plaintiff's Rule 56(a)(2) Statement, hereinafter "Statement," ¶ 53.)

- Though she complains of receiving written discipline for below average performance and having her name posted on a "poor performers" list, she admits that it was not because of her disability, but because her work performance in January and February 2001 was "below average and inferior to her past performance." (Statement ¶ 18.)

- As to another disciplinary incident, she admits that she and a co-worker received the same discipline, and that she used the co-worker's work area, which he complained of.  (Statement ¶¶ 16-17.)

- As to a final disciplinary incident, she admits walking off ACMI's premises during her shift without permission.  (Statement ¶¶ 12-15.)

- The plaintiff claims that ACMI employee Fred King tried to run her off the road on the way home from work **_not because of her purported disability_**, but because of a dispute over trash in the workplace, since the plaintiff had "objected to his throwing balled up paper on her clean work area."  (Plaintiff's Memo, p. 7.)

- Though this car incident admittedly occurred after hours and away from ACMI's premises (Plaintiff's Memo, pp. 7-8.), the plaintiff admits that ACMI allowed the police to come to the plant and let the plaintiff meet with an officer on company time to report the incident.  She also admits that the police took no action against Mr. King.  (Statement ¶¶ 22, 23.)

- She admits that she was twice promoted by ACMI and given the opportunity to train for a third promotion in late 2001.  (Statement ¶¶ 6, 8, 27.)

- She admits that she explicitly agreed to train with Mr. King, in connection with pursuing her third promotion.  (Statement ¶ 32.)

- She admits the time gap between the "car incident" and her training with Mr. King was at least six (6) months.  (See Statement ¶¶ 21, 62.)  The plaintiff has not alleged anywhere that she reported any further problems with Mr. King over this intervening period, and she was able to work on the same shift in the same room with Mr. King throughout this period.  (See Plaintiff's Memo, p. 23 (stating that she was never transferred away from Mr. King).)

- The plaintiff admits that employees must satisfactorily perform the 412 process before they can be promoted.  (Statement ¶ 28.)

• The plaintiff does not dispute that Mr. King was the most skilled ACMI worker on the 412 process. (Statement ¶ 30.) In fact, she admits that another employee was trained by Mr. King on this process (Statement ¶ 38.)

• The plaintiff does admit that she requested not to train with a particular ACMI employee, Margaret Amalfi, and admits that ACMI never placed her with that employee. (Statement ¶ 33.)

• There is no evidence that the plaintiff made a similar request regarding Mr. King. (Statement ¶ 32.)

• The plaintiff admits that Mr. Hill told Mr. King and Mr. Ranita that no bad behavior would be tolerated during the plaintiff's training, and that they agreed. (Statement ¶ 35.)

• She admits that during her training with Mr. King she told her supervisor that Mr. King was behaving "like an angel" during training. (Statement ¶ 34.)

• She reaffirmed, during her deposition in this case, that she was not harassed during her training. (Statement ¶ 61.)

Given these admissions and undisputed material facts, plaintiff cannot establish that the alleged co-worker harassment was so severe and pervasive as to constitute legally actionable objective harassment.

**B.    There was no discrimination by the company because of her disability in failing to accommodate plaintiff or otherwise.**

These undisputed material facts and admissions establish that plaintiff never requested any accommodation of her essential job functions as a result of any disability:

• She admits that she is unaware whether there were any positions on an alternate shift to which she could have been transferred. (Statement, ¶ 56.)

• She admits that she only was placed with Mr. King for 2 or 3 days and then she requested another trainer, and another trainer was provided. (Statement, ¶ 36-37.) The reason she asked to be transferred was not because of any conflict with King, but because she was having difficulty with a particular step of the 412 process, and believed that she could better learn the step using a technique that co-worker Minh Nguyen had shown her. (Statement ¶ 38; Deposition of Daniel Hill, Exhibit E to ACMI's Memorandum in Support of Motion for Summary Judgment ("ACMI's Memo"), hereinafter "Hill Dep.," pp. 65-66; Deposition of Minh Nguyen, Exhibit K to ACMI's Memo, hereinafter "Nguyen Dep.," p. 40.) This demonstrates again that, had

she truly objected to training with Mr. King, she would have had no problem raising the issue, as she did ***just two or three days*** after her assignment to Mr. King.

- She admits ACMI allowed her a total of three (3) separate trainers when she requested them. (Statement, ¶¶ 36-37, 39-40.)

- Though she complains that she was denied leave when she requested it, she admits that she was granted leave by ACMI in December 2002. (Statement ¶ 43.)

- At the point that she allegedly requested this leave, she was admittedly completely disabled from working, and thus no accommodation would have allowed her to work. (<u>See</u> Statement ¶ 47.)

These undisputed facts make clear that plaintiff never requested any accommodation of her essential job functions as a result of her disability, and that she never suffered any discrimination "because of" her disability.

## II.     The Plaintiff Was Not Subjected to a Hostile Work Environment.

Plaintiff claims that she was subjected to a hostile work environment "because of" her disability, as a result of the actions of certain of her co-workers.

### A.     There is no evidence that the plaintiff was harassed "because of" her disability.

To prevail on a hostile work environment claim, an ADA litigant must "show she was a member of the statutorily protected class of employees who are under a 'disability' ***and that the harassment she suffered would not have occurred but for the fact of her disability***." (Emphasis added.) <u>Ferrero v. Henderson</u>, 341 F.Supp.2d 873, 903 (S.D.Ohio 2004) citing <u>Hall v. Gus Const. Co., Inc.</u>, 842 F.2d 1010, 1014 (8th Cir.1988). Here, the plaintiff cannot meet this "but for" test, and has not produced any evidence that she was harassed "because" of a disability (her mental condition). Not one of the acts she complains of makes any reference to her mental status, and no such impetus for the alleged acts can logically be inferred. The acts complained of, such as "ignoring her," "laughing at her" and "whispering about her" constitute treatment that is completely neutral with regard to her alleged condition. She maintains that, because her co-workers perceived her as "moody" and difficult to get along with, this meant that they perceived her as disabled and therefore harassed her on this basis. (Plaintiff's Memo, p. 30.) However, if ACMI employees expressed these observations, the observations could only be considered "isolated, stray remarks," which are not sufficient to demonstrate that someone perceives a co-worker as being disabled. <u>See, e.g.</u>, <u>Pace v. Paris Maintenance Co.</u>, 107 F.Supp.2d

251, 263 (S.D.N.Y. 2000) (collecting cases).  More importantly, courts have held that a perception that someone behaves unusually or performs poorly does not suggest that one is perceived as disabled.  Cody v. CIGNA Healthcare of St. Louis, Inc., 139 F.3d 595, 599 (8th Cir.1998) (Request for a mental examination of an employee who had exhibited strange behaviors does not establish that the employer "regarded" the employee as disabled.)[2]  Additionally, feeling sad or even depressed after the death of one's mother is not a disability, is not permanent, and is something that most people experience.  Therefore, the plaintiff's contentions that she was perceived as moody and difficult to get along with after her mother's death do not suggest that she was disabled, or that she was harassed by co-workers because she was disabled, or even that the action taken by her co-workers constituted harassment.

**B.    There is no evidence of any harassment that could objectively be considered severe or pervasive.**

To prevail on a hostile work environment claim, the plaintiff must prove that her workplace was permeated with conduct that, **objectively**, constitutes severe or pervasive intimidation, ridicule, or insult. "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment-- an environment that a reasonable person would find hostile or abusive--is beyond Title VII's purview."  Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 114 S.Ct. 367 (1993).  ACMI cannot be liable for a workplace that is not objectively hostile or abusive, but merely perceived to be because the plaintiff is unusually sensitive.  See Ragin v. Harry Macklowe Real Estate, 6 F.3d 898, 906 (2d Cir. 1993) (Affirming damage award where District Court discounted plaintiff's unusual sensitivity to discriminatory acts, stating that the "'eggshell skull' doctrine has been applied only in cases where the plaintiff suffered physical injuries.").[3]  Here, the plaintiff cannot point to any alleged conduct that is objectively severe or pervasive.

In response to ACMI's First Set of Interrogatories, the plaintiff listed a handful of incidents allegedly constituting this harassment, none of which could be considered severe, and the combination of which could not be considered pervasive.  (Plaintiff's Interrogatory responses, hereinafter "Int. Resps.," Exhibit 29 to Plaintiff's Memo ¶ 7.)  ACMI's Memo addressed these allegations in its hostile work environment analysis.

---

[2] See also Adams v. Rochester Gen. Hosp., 977 F.Supp. 226, 236 (W.D.N.Y. 1997) ("It simply is not reasonable to expect [the employer] to infer that [the employee] suffered from a mental disability which the ADA would require the [employer] to accommodate from the limited proof of 'strange behavior' and performance problems found in the record."); Lippman v. Sholom Home, Inc., 945 F.Supp. 188, 192 (D.Minn.1996) ("When poor performance results from a disability, 'such behavior is insufficient to impute knowledge of the disability to the employer.'").

[3] See also Schipper v. U.S., 1998 U.S.Dist.LEXIS 16653, *34-*35 (E.D.N.Y. 1998) (Relying on Ragin to limit liability for emotional distress to only that which would have been caused to "a person who did not have plaintiff's heightened emotional sensitivity.")

Now, in an attempt to create a genuine issue of fact, the plaintiff has embellished these incidents, and has added an allegation that co-workers "intentionally bumped into her." (Plaintiff's Memo, pp. 6, 30-31.) The plaintiff also cites the disciplinary counseling she received, the posting of her name atop the "poor performers list," and placing her to train with Fred King as instances of harassment. (Plaintiff's Memo, p. 31.) These new allegations add nothing to her claim. First, the allegations of two co-workers intentionally bumping into her are not actionable. There is absolutely no evidence or allegations that ACMI management had any knowledge of these incidents or that the plaintiff reported them. (See Plaintiff's Memo, p. 4 (explaining reports that were allegedly made to management.)) Also, there is no evidence that plaintiff was bumped into "because of" her mental condition. As to the other newly added allegations, none of the disciplinary incidents she complains of can be considered harassment. Though she complains of receiving written discipline for below average performance and having her name posted on a "poor performers" list, she admits that her work performance in January and February 2001 was "below average and inferior to her past performance." (Statement ¶ 18.). Further, the two remaining disciplinary incidents she complains of were justified. One was where she and a co-worker received the same discipline and where the plaintiff admittedly used the co-worker's work area. (Statement ¶¶ 16-17.) The other was where the plaintiff admittedly walked off of ACMI's premises during the day without permission. (Statement ¶¶ 12-15.) Of course, all of these allegations regarding past discipline are untimely, and are discrete acts that cannot constitute part of any continuing violation theory.[4] These legitimate disciplinary acts by no means constituted harassment. See Padron v. BellSouth Telecommunications, Inc., 196 F.Supp.2d 1250, 1260 (S.D.Fla. 2002) ("The examples given by Plaintiff do not show that any disciplinary action taken by BellSouth constitutes harassment. In contrast, the allegations of Plaintiff are consistent with any workplace environment where an employee will be corrected by a supervisor. Even if Padron was treated rudely by supervisors, this does not constitute harassment.")

As described above, the plaintiff's placement with Mr. King for training was entirely legitimate and she consented to it. In fact, she told Mr. Hill that Mr. King was behaving "like an angel" during the training. The

---

[4] See Conn. Gen. Stat. § 46a-82(e) (Stating that complaints must be filed with CHRO within 180 days from the date of the alleged discriminatory act); 42 U.S.C. § 2000e-5(e)(1) (setting federal law filing deadlines); Williams v. Commission on Human Rights and Opportunities, 257 Conn. 258, 264 (Conn. 2001)(Failure to comply with these time limits bars plaintiffs from asserting such claims in court); Gomes v. Avco Corn., 964 F.2d 1330, 1332-33 (2d Cir.1992) (same); Katz v. Beth Israel Medical Center, 2001 WL 11064, *11 (S.D.N.Y. 2001) ("Disciplinary warnings or actions, however, are discrete acts, "more in the nature of an isolated employment decision than a persistent pattern.").

plaintiff has reaffirmed this and testified that she was not harassed during the training.  The "car incident," of course, was an out-of-work occurrence that ACMI cannot be held responsible for.  The plaintiff cites no caselaw to refute ACMI's argument in this regard.  These incidents, and their combination are not sufficient, as a matter of law, to give rise to a hostile work environment claim.

Evidently, sensing this problem, the plaintiff concentrates on the subjective, rather than objective, test for determining whether a hostile work environment existed.  To that end, she cites the testimony and notes of her psychiatrist and family doctor.  However, plaintiff must prove that the environment was hostile both objectively and subjectively.  Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 114 S.Ct. 367 (1993).

In Cioffi v. The Allen Products Co., 2000 WL 33180448 (D.Conn 2000)(Squatrito, J.), this Court granted summary judgment to the defendant employer where sexually harassing comments were more severe than those at issue in this case.  The Cioffi case included the following allegations: 1) a supervisor spreading rumors of the employee's affair at work; 2) a co-worker waving a page with drawings of penises on it in front of her; 3) "numerous" off-color jokes being told in her presence; 4) her co-worker reading a newspaper leaning up against her cubicle, and; 5) a co-worker laughing at a statement in front of the plaintiff that had a sexual connotation.  Id. at *10.  The Court held that such allegations were, as a matter of law, not sufficiently severe or pervasive to sustain a hostile work environment claim.  Id.  For these same reasons, the Court also dismissed the plaintiff's constructive discharge claim.  Id. at *13-*15. Certainly, unlike in Cioffi, there are not "numerous" comments alleged here, and the ones that are alleged were innocuous.  The instant case involves much less serious allegations than in Cioffi, such as co-workers "ignoring" the plaintiff, and her unfounded belief that co-workers were whispering about her on an unknown subject.

The plaintiff cites a series of cases from other circuits and includes parentheticals which ostensibly seem to support her claim that the particular court found analogous circumstances to be actionable hostile work environments.  However a closer look at these cases indicates that they all feature far more serious misconduct than that alleged here.  For example, she cites Pollard v. E.I. DuPont de Nemnours Co., 213 F.3d 933 (6th Cir 2000) and suggests that the court found a hostile work environment where the plaintiff there was run off the road by her harasser and was subjected to harassing comments.  (Plaintiff's Memo, p. 32.)  However, the road

incident was not even mentioned by the court in the rationale for its decision, and the conduct involved was far

more pervasive and severe than that alleged here:

> Plaintiff here proved daily sexually degrading comments about women which often occurred outside of her hearing; a co-worker who instructed the men working as her assistants not to take direction from plaintiff or talk to her at any time because of her gender; several incidents of plaintiff not being informed of facts concerning her job which would result in an appearance of incompetence on her part, and which could be potentially physically dangerous to her and to other members of the plant; isolated incidents occurring within her hearing of women being called 'heifers' and being degraded for their inability to accomplish tasks as well as men; being subjected to false alarms and practical jokes, such as her dinner being burned, with the alleged intent of driving plaintiff away from her shift; and the Bible verse concerning women's proper submissive role being placed in her locker.

Id. at 942.  Similarly, Henderson v. Simmons Foods, Inc., 217 F.3d 612 (8th Cir. 2000) includes these

allegations:

> "[the harasser] harassed [the plaintiff] almost continuously from 1994 to 1995, and throughout 1997. He reviled her with a barrage of sexual vulgarities and taunted her with a cannonade of perverted anatomical traducements. He also groped her. On one occasion, he rubbed his pelvis up against her backside. On another occasion, he shoved a broom handle into the crotch area between her legs."

Id. at 616.  These cases are clearly not analogous.

### C.    ACMI is not liable for the alleged harassment.

Additionally, the plaintiff asserts that ACMI should be vicariously liable for co-worker harassment.

She agrees that harassment by co-workers (as opposed to supervisors) can only be imputed to ACMI if it knew

of the harassment and should have and failed to take reasonable remedial action.  Here, she claims that

management knew of harassment, but did nothing to stop it.[5]  She admits that she does not recall whether she

stated to Mr. Scaglia that she was being harassed because of her disability.  (Statement ¶ 53.)  Instead, she

claims management knew that the harassment was based on her disability, because two of the harassers had told

her supervisor, Mr. Scaglia, that plaintiff was "moody" and difficult to get along with, and she appeared

saddened by her mother's death.  (Plaintiff's Memo, pp. 4, 5, 41.)  As set forth above, in no way do these facts

gives rise to an inference that the plaintiff is disabled and is being harassed on that basis.  If someone is

saddened by his or her mother's death, is moody or difficult to get along with, it does not follow that that

---

[5] In her Memo, the plaintiff cites the deposition testimony of her Sister to support her contention that she complained to management. (Plaintiff's Memo, p. 5.)  She also cites her Sister's deposition testimony to back up her allegations regarding the "car incident."  Id. at 8.  This testimony is hearsay from someone with no independent personal knowledge, is therefore inadmissible, and should not be considered by the Court.

person is disabled under the law.  Co-workers complain every day about temperamental colleagues.  That does not logically give rise to knowledge that the temperamental colleague is disabled under the law.

The plaintiff claims in her Memo that Mr. Scaglia told plaintiff "that the more she complained to him about her co-workers' misconduct, the more they would harass her," and cites Mr. Scaglia's deposition at pages 164 to 165.  (Plaintiff's Memo, p. 5.)  However, this is completely unsupported by and is contrary to his testimony.  Mr. Scaglia never made any statement or implication of this nature.  In fact, Mr. Scaglia stated, regarding the alleged harassment, "If I ever catch it, I'll stop it."  (Deposition of John Scaglia, Exhibit 11 to Plaintiff's Memo, hereinafter "Scaglia Dep.," p. 165.)

The plaintiff also argues that ACMI is liable for supervisor harassment because it cannot take advantage of either prong of the "Faragher defense," but this defense only comes into play if there was actionable harassment—which is not the case here.  Moreover, it is undisputed that Mr. Scaglia made it clear to plaintiff that he would not tolerate any co-worker harassment (see above) and plaintiff has not alleged any actionable conduct by a supervisor.[6]

## III.    ACMI Never Discriminated Against Plaintiff "Because Of" Her Disability, Or Denied Her A Reasonable Accommodation.

Plaintiff argues that she suffered disability discrimination because ACMI denied her requests for reasonable accommodation.  Upon even cursory inspection, however, what plaintiff now seeks to characterize as requests for "reasonable accommodation" under the ADA are in fact a collection of complaints she purportedly raised with ACMI, primarily about her co-workers.  Significantly, it is undisputed that plaintiff never stated, or suggested, that the so-called "accommodations" she was requesting were related to a purported disability.  Absent a nexus with a purported disability, there is no violation of the ADA's reasonable accommodation obligation.

In addition, as explained below, the undisputed evidence demonstrates that plaintiff was fully able to perform her job duties up until she left her position with ACMI, and that she never required an accommodation

---

[6] The plaintiff also argues that, under Pennsylvania State Police v. Suders, -- U.S. --, 124 S.Ct. 2342 (2004), the Faragher defense does not apply when there is a constructive discharge alleged.  However, this is not the holding of Suders.  Rather, Suders holds that, under the Faragher doctrine, constructive discharge is not sufficient in itself to qualify as a tangible employment action, and therefore the Faragher defense still applies absent some other adverse employment action, such as a firing, demotion or loss of pay.  Suders, 124 S.Ct at 2355.  There is no such adverse employment action alleged here, and ACMI is entitled to the Faragher defense in this case.

to do her job.  For this additional, and independent, reason, plaintiff's ADA discrimination, and failure to accommodate, claims must be dismissed.

Finally, tacitly conceding that the *specific* complaints she now seeks to cast as a reasonable accommodation requests are not ADA violations, plaintiff complains that ACMI refused to engage in the *general* obligation to engage in an interactive process.  It is well-settled, however, that whatever obligation an employer may have to engage in such a process – and no such obligation has been recognized by the Second Circuit[7] – the obligation generally does not arise unless an employee requests an accommodation and indicates a nexus with a disability.  Because plaintiff never did this, her generalized "failure to engage in an interactive process" claim must be dismissed as well.

     **A.**     **There is no evidence that plaintiff requested an accommodation "because of" a purported disability.**

It is well settled that an employee has the initial obligation to come forward and request an accommodation, and that the request must be explicitly related to a known disability.  Huppenbauer v. May Dept. Stores Co., 99 F.3d 1130, 1996 WL 607087, *7 (4th Cir. 1996).  Absent a nexus with a disability, a request (or workplace complaint for that matter) is not one for "reasonable accommodation" under the ADA.  As the Second Circuit has made clear, this is a critical requirement:  a plaintiff cannot maintain an ADA reasonable accommodation claim without demonstrating that the requested accommodation was necessary "because of her disability."  Felix v. New York City Transit Authority, 324 F.3d 102, 107 (2d Cir. 2003).

Even accepting plaintiff's account of the various complaints she raised with her managers (discussed more specifically below), there is absolutely no evidence that she ever explicitly, or implicitly, indicated to these managers that her complaints had any relationship to a purported disability.  Indeed, although plaintiff's opposition papers are replete with exaggerated references to complaints she raised about working conditions and her co-workers – which she now hopes to characterize as accommodation requests – there is no evidence that she linked these complaints, at time they were made, to a purported disability.  Rather, she implies that ACMI should have known that her complaints related to a disability (because she was moody and had trouble getting along with her co-workers).  The law is quite clear, however, that an employer cannot be expected to speculate as to an employee's impairments and need for accommodation.  See, e.g., Gantt v. Wilson Sporting

---

[7] Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 219 (2d Cir. 2001).  The plaintiff's failure to accommodate claims fail for this reason as well.

Goods Co., 143 F.3d 1042, 1046-47 (6th Cir.1998). Indeed, by placing the onus on the employee initially to request reasonable accommodation, the ADA refutes any notion that the employer should engage in such mind-reading endeavors. Accordingly, regardless of whether her requests were granted or denied, or were reasonable or not, without the requests being linked to her alleged disability, her claim that she was denied accommodations under the ADA or CFEPA fails.

> **B.** **Plaintiff's complaints were not requests for accommodations to enable her to perform her essential job duties.**

In an ADA reasonable accommodation claim, the plaintiff bears the burden of proving the "existence" of an "effective accommodation" and this burden cannot be satisfied by speculation. Borkowski v. Valley Central School District, 63 F.3d 131, 137-39 (2d Cir.1995). A failure to accommodate claim requires proof that an accommodation existed that would have permitted the plaintiff to "perform the essential functions of the position," which is an integral component of a failure to accommodate claim. Stone v. City of Mount Vernon, 118 F.3d 92, 96-97 (2d Cir.1997). Only once this initial burden is satisfied is the employer required to show that a requested accommodation is not reasonable. Borkowski, 63 F.3d 137-39.

Aside from lacking an explicit nexus with a purported disability -- itself fatal to plaintiff's reasonable accommodation claim -- none of plaintiff's so-called accommodation requests relate to plaintiff's ability to perform her essential job functions. In fact, plaintiff admits that throughout her employment with ACMI, until she left her job, she was fully able to perform all of her job duties, without accommodation. (See Statement ¶ 54.) Because it is undisputed that plaintiff did not require reasonable accommodation to do her job, her claim that she was denied reasonable accommodation must necessarily fail as a matter of law.

In addition, the undisputed facts surrounding the complaints that plaintiff now seeks to cast as requests for reasonable accommodation belie her contention that she was denied an accommodation to perform her job duties. These complaints fall into five categories: (i) that her co-workers stop harassing her; (ii) that management stop the "loud music and yelling" in the department; (iii) that she be permitted to take a leave of absence; (iv) that she be transferred to the day shift; and (v) that she not be required to work near and/or be trained by Fred King. (Plaintiff's Memo, p. 23.) Apart from the fact that the plaintiff never put ACMI on notice that she required any of these accommodations "because of" an alleged disability, the undisputed facts show that none of them qualify as a claim for denial of a reasonable accommodation.

(i) *Purported Harassment.*  Plaintiff's complaint that her co-workers were harassing her is simply a verbatim rehash of her hostile work environment claim, which is baseless for the reasons discussed above.  This Court should not countenance plaintiff's attempt to re-cast a failed hostile work environment claim as one for reasonable accommodation, especially when plaintiff provides not a scintilla of case authority supporting such a strained interpretation of the ADA.  That plaintiff would even attempt to dress up a deficient hostile work environment claim as a denial of a request for reasonable accommodation only underscores the weakness of her ADA claim.

(ii) *"Yelling and Loud Music."*  Equally meritless is plaintiff's allegation that ACMI denied her a reasonable accommodation by not stopping the "yelling and loud music" on her shift.  There is no evidence that plaintiff ever linked this request with a purported disability and, absent such a link, the complaint indisputably sounds like a fairly mundane and mild employee complaint.  Although plaintiff may well have preferred to work in a quieter environment, the ADA is not a vehicle to transform such preferences, however sympathetic, into civil rights violations.

(iii) *Leave of Absence.*  Although plaintiff claims that she was denied a leave of absence, the only evidence she presents to support this contention is the deposition testimony of Mr. Scaglia, who testified about a purported leave request just after the plaintiff's mother died, which occurred *in February 2000.*  (Scaglia Dep., pp. 165-66; Statement ¶ 9).  Such a leave request is indisputably time barred because it occurred well over 300 days before the filing of the CHRO complaint.  See Conn. Gen. Stat. § 46a-82(e); 42 U.S.C. § 2000e-5(e)(1) (setting federal and state law filing deadlines).  Moreover, as is the case with all her so-called accommodation requests, there is no evidence that plaintiff linked this alleged request to any alleged disability.

What plaintiff fails to mention, however, is that in December 2001 she requested – and ACMI granted – her request for a leave.  (Deposition of Plaintiff, Exhibit 1 to Plaintiff's Memo, hereinafter "Pl. Dep.," pp. 121-22.; Statement ¶ 43.)  Thus, the only leave of absence plaintiff requested *within* the 300-day statute of limitations period was granted.  In addition, at the point that she allegedly requested this leave in December 2001, plaintiff was admittedly completely disabled from working, and thus no accommodation would have allowed her to work at this point.  (See Statement ¶ 47.)

(iv) *Transfer to Day Shift.*  Plaintiff claims that ACMI refused to transfer her to the day (or first) shift. There is no evidence, however, that this request was based on anything more than a preference, and no evidence that she linked this request to a disability.  Moreover, although plaintiff cannot remember when she made this request (Int. Resps. ¶¶ 11, 13.), Mr. Scaglia testified that it occurred after her mother died in February 2000, making this failure to accommodate claim untimely as well.  (Scaglia Dep., pp. 169-70.)  Finally, plaintiff testified that she cannot remember whether there was a first shift vacancy to which she could have been transferred (Statement ¶ 56.), and Mr. Scaglia testified that there were, in fact, no first shift vacancies at the time of the plaintiff's request.  (Scaglia Dep., pp. 170.)  It is well-settled in this Circuit that the plaintiff asserting failure to transfer in an ADA accommodation case has the burden of showing that a vacancy existed at the time of the transfer request.  See Jackan v. New York Dept. of Labor, 205 F.3d 562, 566 (2nd Cir. 2000) ("We hold that, in order to recover under the ADA…for a failure to reasonably accommodate by transfer, a plaintiff bears the burden of establishing that a vacancy existed into which he or she might have been transferred.").  Plaintiff clearly has not satisfied this burden.

(v) *Working and Training with Fred King.*  Finally, plaintiff complains that she was forced to work alongside of, and eventually train with, Fred King, and that this was discriminatory and somehow amounted to a denial of a reasonable accommodation.  As a preliminary – albeit dispositive – matter, ACMI has cited ample Second Circuit authority in its opening brief (p. 17) holding that an inability to work with a particular individual does not render an employee disabled, and there is no obligation to transfer an employee away from a particular co-worker as an accommodation.  Plaintiff cites no authority within this Circuit to the contrary.

Second, and equally dispositive, there is no evidence that ACMI ever denied a request by plaintiff not to work alongside of, or train with, King.  In fact, as explained below, the *only* time that plaintiff asked not to work or train with King (and even this time, she made no mention of disability), ACMI immediately acceded to the request.

Plaintiff's complaints about King, and indirectly ACMI, emerge from an incident that allegedly occurred in early 2001 -- outside of ACMI's premises, during non-work hours, and not involving ACMI -- in which plaintiff claims King tried to run her off the road with his car.  Even though the incident did not involve ACMI, plaintiff concedes that the company allowed her to meet with the police at work, and on company time,

to report the incident.  She also admits that the police took no action against Mr. King.  (Statement ¶¶ 22, 23.)  Significantly, there is no evidence that ACMI refused any request she made with respect to this incident, and her sole accusation is that the company should have done more to "investigate" this off-premises incident.  Aside from the fact that plaintiff nowhere explains on what basis ACMI, more so than the police, should be charged with responsibility for investigating this alleged incident, there is nothing about the incident – regardless of what actually occurred – that suggests discriminatory animus on the part of ACMI.

After this alleged incident occurred in early 2001, plaintiff worked alongside of King for approximately another six months.  There is no evidence that she had any difficulties working with King during this time, or complained about him.  To the extent plaintiff bases her reasonable accommodation claim on her being required to work alongside of King during these six months, the claim must fail because she never requested otherwise, and she was admittedly able to perform her job duties despite King's proximity.

Plaintiff next complains that ACMI assigned her to be trained by King when she applied for a promotion to First Class Medical Instrument Maker, six months after the alleged "car incident." (See Statement ¶¶ 21, 27, 62.).  First, there is no dispute, indeed plaintiff concedes, that there were legitimate reasons to assign plaintiff to train with King.  Plaintiff admits that, before employees can be promoted to First Class Medical Instrument Maker, they must satisfactorily perform the 412 assembly process, and that  King was the most skilled ACMI worker on the 412 assembly process.  (Statement ¶ 28, 30.)   In fact, another employee, Minh Nguyen, was trained by Mr. King on this same process (Statement ¶ 38.)  Plaintiff also admits that King was the logical choice to train her because "I didn't think there was anyone else available at night."  (Pl. Dep., p. 96).  Accordingly, it was perfectly logical, and certainly not discriminatory, for ACMI to assign plaintiff to train with King so that she could learn the 412 assembly process and be promoted.

Even though six months had elapsed since the "car incident," and there were no further complaints from plaintiff about King, ACMI took reasonable steps to insure that King's training of plaintiff was in no way problematic.  Mr. Hill approached plaintiff about training with Mr. King on the 412 assembly process, and asked  her "if it would be okay to train with Mr. King."  (Pl. Dep., p. 94.)  Plaintiff admits that she responded that it would be: "I must have said to him yes, I will go with Chris and Fred.  Everything will be fine.  I will do."  (Pl. Dep., pp. 124-25)  Plaintiff also admits that she thought she "could handle it" and would "give it a

shot". (Pl. Dep., pp. 93-94.)  Plaintiff nevertheless charges ACMI with the obligation to somehow read her

mind and conclude, despite her statements to the contrary, that she was afraid to work with King.  Beyond the

preposterous suggestion that ACMI should have known that "yes means no," there is not a shred of evidence of

discriminatory animus behind ACMI's conduct here.  Nor is it possible to reconfigure these undisputed facts

into a contrived reasonable accommodation claim.

Desperate to avoid the consequences of her admission that she was willing to be trained by King,

plaintiff claims that it was insinuated that she had no choice but to do so.  It is undisputed, however, that she

well understood that she had the ability to request whom, and whom not, to train with, and she was not at all

shy about expressing her preferences.  Yet, her **_only_** request was not to train with Ms. Amalfi (with whom she

also had personal conflicts), and she admits that ACMI never placed her to train with Ms. Amalfi.  (Statement ¶

33.)  There is no evidence that plaintiff made a similar request regarding Mr. King, and no evidence suggesting

that ACMI would not have acceded to the request had it been made.  (Statement ¶ 32).

Even after plaintiff agreed to train with King, ACMI took the additional precaution of warning Messrs.

King and Ranita that no bad behavior would be tolerated during the plaintiff's training, and that they agreed.

(Statement ¶ 35.)  In fact, plaintiff admits that she told Mr. Hill that Mr. King was behaving "like an angel"

during training. (Statement ¶ 34.)  She also admits that she was not harassed in any way by Mr. King during the

training.  (Statement ¶ 61.)  Thus, whatever unspoken fears plaintiff might have harbored about working with

King, they turned out to be unwarranted.

Finally, plaintiff admits that she only trained with Mr. King for 2 or 3 days at which point she

requested another trainer.  Without hesitation, ACMI appointed a new trainer.  (Statement, ¶ 36-37.)  Moreover,

it is undisputed that the reason she asked to be transferred was not because of any conflict with King, but

because she was having difficulty with a particular aspect of the 412 assembly process, and believed that she

could better learn the step using a technique that co-worker Minh Nguyen had shown her.  (Statement ¶ 38; Hill

Dep., pp. 65-66; Nguyen Dep., p. 40.)   The fact that plaintiff asked to be, and was, reassigned to a new trainer

*two or three days* after beginning training with King completely refutes her contention that she was too afraid

to object to King, or felt that she had no choice but to train with him.  Had she spoken up two days earlier, there

is every reason to believe that the result would have been precisely the same, *i.e.*, she would have been assigned to train with someone other than King.

In sum, despite plaintiff's efforts to castigate ACMI for what she believes to be the insensitive act of asking her to train with King, the undisputed facts demonstrate that ACMI acted entirely reasonably under the circumstances, and plaintiff agreed to be trained by King. More importantly, however, regardless of how one views the actions of ACMI, there is no evidence whatsoever that its actions were motivated by discriminatory intent, or that they amounted to a denial of a requested reasonable accommodation due to disability.

### C.    ACMI never refused to enter into an interactive process with plaintiff.

Perhaps sensing the infirmity of her specific reasonable accommodation allegations, plaintiff seeks to take refuge behind an employer's purported general obligation to engage in an "interactive process" with a disabled employee. Nevertheless, as explained above, it is still the employee's obligation, in the first instance, to come forward and raise the accommodation issue – only then would any ADA interactive process begin. Indeed, the ADA is designed to ensure that "truly disabled, but genuinely capable, individuals will not face discrimination in employment because of stereotypes about the insurmountability of their handicaps." Francis v. City of Meriden, 129 F.3d 281, 286 (2d Cir.1997). For that reason, the employer generally may not assume that an employee requires an accommodation to perform their job. Rather, unless obvious, the employee must first put the employer on notice of a disability *and* need for accommodation. Rodal v. Anesthesia Group of Onondaga, P.C., 369 F.3d 113, 120 (2d Cir. 2004).

As explained above, there is no evidence that any of plaintiff's complaints – which she awkwardly tries to cast as reasonable accommodation requests, were expressly linked with any disability. Plaintiff attempts to skirt this significant deficiency by asserting that ACMI knew she was "moody" and "difficult," and that she "was suffering from emotional disabilities following the death of her mother and that she was having trouble functioning in the workplace." (Plaintiff's Memo, pp. 4, 23). However, the only facts she musters to support this conclusion is that, after her mother's death in 2000, she cried at work, and had difficulty getting along with co-workers. (Plaintiff's Memo, p. 4). Knowing that an employee is "moody" or "difficult" is undeniably not equivalent to knowing that an employee is disabled within the meaning of the ADA (i.e., substantially limited

in one or more major life activities), let alone knowing that the disabled employee also requires a reasonable accommodation.  Not surprisingly, plaintiff has not cited a single case suggesting otherwise.

Moreover, even if plaintiff's "moody" and "difficult" behavior could be equated with knowledge of a mental impairment – however implausible this may be – plaintiff still cannot satisfy one additional condition necessary prior to any purported interactive process obligation.  It is well established that "an employer's knowledge of an impairment is not sufficient to prove that the employer was aware of a desire by the employee for an accommodation."  Kanofsky v. Univ. of Med. & Dentistry, 50 Fed.Appx 546, 548 n.3 (3rd Cir. 2002). Accordingly, plaintiff must at least point to some evidence to demonstrate that ACMI knew that she required an accommodation to perform the functions of her job to prevail on her failure to enter an interactive process claim.  Id.  As described above, plaintiff remained a productive employee until December 2001 when she left (and was in fact up for a promotion).  Plaintiff cites no authority for the absurd proposition that an employer has an obligation to engage in an ADA interactive process with an employee, who happens to be performing her job, simply because the employee appears "moody" and "difficult."

The cases cited by the plaintiff on pages 20-27 of her Memo are all distinguishable in one crucial respect.  They all involved situations where the employer *knew* that the employee had a disability *and* that the employee required accommodation related to the *known* disability.  Here, as set forth above, ACMI had no knowledge that the plaintiff had a disability, and no knowledge that she required reasonable accommodation due to that disability.

###### D.     The plaintiff's CFEPA accommodation claim fails to state a cause of action.

As argued in ACMI's Memorandum in Support of Motion for Summary Judgment ("ACMI's Memo"), there is no reasonable accommodation obligation under state law.  The plaintiff responds to this argument by citing trial court cases recognizing such an obligation.  (Plaintiff's Memo, p. 28, n.17.)  However, none of these cases address ACMI's primary argument that the Second Circuit's holding and rationale in Beason v. United Technologies Corp., 337 F.3d 271 (2d Cir. 2003) forecloses this result.  There, the court held that "[b]ecause the specific language of CFEPA makes no mention of a cause of action for 'perceived' or 'regarded as' physical disability discrimination, we do not believe it was part of the Connecticut legislature's purpose that such a cause exists."  Id. at 279-80.  Similarly, the lack of any mention in CFEPA of an accommodation

obligation (whereas the ADA makes such a mention) dictates that none was intended.  The existence of an obligation to enter into an interactive process is also conspicuously absent from CFEPA.  Similarly, until 1998, the New York Human Rights Law did not impose upon private employers an explicit duty to "reasonably accommodate" an employee's disability.  Muszak v. Sears, Roebuck & Co., 63 F.Supp.2d 292, 299 (W.D.N.Y.1999).  Absent such an express requirement, courts declined to impose one.  See, e.g., Hendler v. Intelecom USA, Inc., 963 F.Supp. 200, 211 (E.D.N.Y.1997) (holding that there is no basis in the statute to conclude that an employer is required to provide reasonable accommodation to employees with disabilities).

**IV.     There Is No Evidence that the Plaintiff was Constructively Discharged.**

The plaintiff also relies on the hostile work environment claims set forth above to support her constructive discharge claim.  In order to prevail on this claim, plaintiff would have to show that the workplace conduct was so intolerable that it would force a reasonable person to resign.  This is an even tougher standard to meet than the standard for proving a hostile work environment.  (See ACMI's Memo, p. 21.)  For this reason, her constructive discharge claim fails as well.

**V.      There Is No Evidence that the Plaintiff was Retaliated Against.**

The plaintiff's retaliation claims fail for the reasons set forth above: first, she engaged in no protected activity, and; second, she suffered no adverse employment action.  Again, the plaintiff cites no complaints in which she linked her supposed treatment with her mental condition, and there is no evidence that Mr. Scaglia had notice of a mental impairment.  This alone is fatal to her claim. See Barber v. CSX Distrib. Servs., 68 F.3d 694, 701-02 (3d Cir.1995) (holding that the plaintiff's letter to the human resources department complaining of unfair treatment in general and not specifically complaining about age discrimination did not constitute protected activity).  The complaint must specifically mention the plaintiff's belief that she was discriminated against on account of her membership in some protected class.  See id.

She claims that the adverse employment actions she suffered as retaliation were: the creation and exacerbation of a hostile work environment; written counseling citing poor performance and behavioral concerns; being placed on a "poor performers list;" and being required to train with Fred King.  As set forth above, she cannot demonstrate a hostile work environment (these are mostly the same allegations set forth to support the hostile work environment claim, and include no new allegations (Plaintiff's Memo, p. 42)), her

discipline regarding her performance is admittedly merited (and those complaints are untimely), and she agreed to train with Mr. King.  ACMI is entitled to summary judgment on plaintiff's retaliation claims.

**VI.    The Plaintiff's Application for and Receipt of Social Security Benefits Precludes Her Claims.**

In ACMI's Memo, it argued that that plaintiff's sworn statement on her Social Security disability benefit application that she became totally disabled in December 2001 precluded her constructive discharge claim.  Because she admitted that she was totally disabled from working at that time, ACMI was not obligated to retain her.  In response, plaintiff argues that she was a qualified individual with a disability up to the time she resigned.  She argues that ACMI caused her to become disabled, and that fact dictates that ACMI cannot take advantage of her becoming disabled to escape liability.  She cites three out-of-circuit district court cases that purport to support this contention.  However, even by those cases, the Court would have to find that ACMI caused her to become disabled by illegal harassment that it is responsible for, a showing which cannot be made.

However, the plaintiff does not address ACMI's argument that the statements in her application preclude her claim that she was maliciously contacted in May 2002 by ACMI to return to work.  (Amended Complaint ¶ 22.)  At that time, though she was still technically an ACMI employee on disability leave, plaintiff must concede she had already admitted she was totally disabled and the alleged contact could not have affected the terms and conditions of her employment.

**VII.    The Plaintiff's CHRO Complaint Was Untimely.**

The plaintiff admits that her CHRO complaint was filed more than 180 days after her last day working at ACMI (see Statement, ¶ 49), and that the CHRO specifically held that all of her claims arising prior to January 3, 2002 were untimely.  (Statement, ¶ 50.)  She argues, however, that her claims are saved by equitable tolling and the continuing violation doctrine.  (Plaintiff's Memorandum, § B.5.)  Neither theory is applicable.

**A.    Equitable tolling does not apply here.**

In support of her effort to demonstrate a genuine issue of fact, the plaintiff relies upon the testimony of her psychiatrist that she was fearful of returning to work in the period following December 2001, and therefore emotionally unable to file a complaint with the CHRO.  (Plaintiff's Memo., p. 53.)  She also includes an affidavit stating that she was unable to make a decision to pursue a claim until June 12, 2002.  Id.

Despite these contentions, the key facts here are not in dispute.  The plaintiff admits that she met with her attorney on May 10, 2002 and filed an application for social security benefits on March 7, 2002.  (Statement, ¶ 69.)  Most importantly, she admits to her sworn statement in her social security disability application that her condition did not improve between March and July 2002.  (Statement, ¶ 71).  Thus, according to her own sworn statement, her mental condition made it no more possible for her to file a complaint in June than in March, which would have been well-within the allowable period.  Though she now attempts to overcome this statement by attesting that she was unable to make a decision to pursue a claim until June 12, 2002, her affidavit has no probative value in this case.  See Trans-Orient Marine Corp. v. Star Trading & Marine, Inc., 925 F.2d 566, 572-73 (2d Cir.1991) ("The rule is well-settled in this circuit that a party may not, in order to defeat a summary judgment motion, create a material issue of fact by submitting an affidavit disputing his own prior sworn testimony."); Zigmund v. Foster, 106 F.Supp.2d 352, 356 (D.Conn.2000) (The mere verification by affidavit of one's own conclusory allegations is not sufficient to oppose a motion for summary judgment.)

Though the plaintiff further argues that she did not file a complaint with the CHRO because she was afraid of "reprisals from ACMI employees," a fear of retaliation is not sufficient in a case like this, when plaintiff was already on extended leave and out of the workplace.  Parola v. I.R.S., 1999 WL 1215557, *5 (E.D.N.Y. 1999) ("Because [plaintiff] was already removed from his employment at the time he should have filed his complaint, he cannot now rely on his fear of retaliation to excuse his failing to exhaust.")  Because equitable tolling does not apply here, the plaintiff's state law discrimination allegations are untimely and summary judgment is appropriate.  Kahn v. Fairfield Univ., -- F.Supp.2d --, 2005 WL 464940, *6 (D.Conn. 2005) (Feb. 2005 case granting summary judgment to employer and refusing to apply equitable tolling to extend CFEPA filing period past 180 days.)

### B.    There was no continuing violation.

The plaintiff also points to her allegation that she was contacted in May 2002 to return to ACMI as the final act in a continuing violation that would toll the filing period.  However, plaintiff cites no evidence to support her allegation that she was so contacted, and only points to her Amended Complaint.  This is not sufficient.  In opposing a motion for summary judgment, the "adverse party may not rest upon the mere

allegations or denials of [its] pleading," but must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56; see D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir.1998). Moreover, this incident could not possibly be considered harassment (in the normal work-a-day world, a possibility of returning to work is viewed as favorable), and, as indicated above in Section V, her sworn statement that she was totally disabled at that time precludes this claim. Without an actionable incident that is timely brought, her continuing violation claim fails.

## VIII.    The Plaintiff's Intentional Infliction of Emotional Distress is Legally Insufficient.

The plaintiff argues that there is a genuine issue as to whether the conduct of ACMI's employees was "extreme and outrageous," as is required to withstand summary judgment on this claim. However, the specific conduct cited (the same conduct cited to support her hostile work environment and constructive discharge claims) is simply not extreme or outrageous enough.

It is clear that the plaintiff's claim that she suffered harassment because of her disability and that ACMI management did not take sufficient steps to remedy the alleged harassment does not give rise to liability under this tort. Morrissey v. Yale University, 268 Conn. 426, 427-428 (2004) (Plaintiff alleged employer intentionally inflicted emotional distress by failing to properly respond to harassment complaint, court held that "no reasonable jury could conclude that an average member of the community would find the defendant's conduct to have been extreme and outrageous.").[8] This Court has noted similarly in dismissing a claim under this tort. Allen v. Egan, 303 F.Supp.2d 71, 78 (D.Conn. 2004)(Squatrito, J.) ("[Plaintiff's] allegations, which the courts accepts as true for the purposes of this motion, essentially amount to employment discrimination. Although employment discrimination is illegal, it does not per se give rise to a claim for intentional infliction of emotional distress.").

The plaintiff also argues that her claim is aided by her contentions that: 1) ACMI knew she was particularly susceptible to distress, and; 2) there was a retaliatory motive behind the alleged harassment. To that end, she cites cases that she believes supports her position. However, all these cases are from other jurisdictions or were decided before Dollard v. Board of Education, 63 Conn.App. 550, 552-53 (2001), and Appleton v. Board of Education, 254 Conn. 205, 211 (2000), which set the bar extremely high for proving this

---

[8] Accord Pascal v. Storage Technology Corp., 152 F.Supp.2d 191, 214 (D.Conn.2001) (holding that an employer's failure to adequately protect the plaintiff from an arguably hostile work environment was not extreme and outrageous).

tort in Connecticut. More recent decisions make it clear that, in the employment context, it is the employer's conduct, not the motive behind the conduct, that must be extreme or outrageous. See, e.g., Huff v. West Haven Board of Education, 10 F.Supp.2d 117, 123 (D.Conn.1998). An employer's adverse yet routine employment action, even if improperly motivated, does not constitute extreme and outrageous behavior when the employer does not behave in an egregious manner. See, e.g., Hill v. Pinkerton Security & Investigation Services, Inc., 977 F.Supp. 148, 160 (D.Conn.1997) (Included paying an African-American female less money than her counterparts and disciplining, reprimanding, and transferring her to two other locations).[9] Thus, plaintiff's claim that her treatment was retaliatory or with knowledge that she was impaired does not assist her. Moreover, as set forth in Section II.B above, under Second Circuit law, the "eggshell skull" doctrine does not apply to cases not involving physical injury, and any particular sensitivity to emotional distress by the plaintiff does not decrease her lofty burden here.

The plaintiff also makes much of her allegations that she was twice "bumped" by co-workers. She cites Cole v. Terrell Moorehouse, 2002 WL 31304178 (Conn.Super., Sept 18, 2002), for the proposition that courts do not strike intentional infliction claims where physical touching has occurred. However, that allegation cannot be considered part of her intentional infliction claim for two reasons: 1) the conduct cannot be imputed to ACMI,[10] and; 2) the claim is barred by the workers' compensation exclusivity rule.[11]

IX.    **The Plaintiff Failed to Exhaust Her Grievance Remedies.**

In response to ACMI's argument that her Intentional Infliction of Emotional Distress claim is precluded by virtue of her failure to exhaust grievance remedies, the plaintiff argues that she was not required to exhaust such remedies. She admits, however, that her collective bargaining agreement contains grievance

---

[9] See also White v. Martin, 23 F.Supp.2d 203, 208 (D.Conn.1998), aff'd, 198 F.3d 235 (2d Cir.1999) (employer's alleged discrimination, denial of a promotion, discipline, and harassment based on plaintiff's gender not extreme or outrageous).

[10] Employers can only be held liable for intentional acts of an employee if the employee was acting within the scope of his employment and the acts were done in furtherance of the employer's business. See Larsen Chelsey Realty Co. v. Larsen, 232 Conn. 480, 500 (1995). Ordinarily, the question of whether the employee's tort occurred within the scope of his employment and in furtherance of his master's business is to be determined by the finder of fact, but "there are occasional cases where a servant's digression from duty is so clear-cut that the disposition of the case becomes a matter of law." A-G Foods, Inc. v. Pepperidge Farm, Inc., 216 Conn. 200, 207 (1990). Here, it cannot be contested that these alleged bumpings, if true, were outside the scope of employment and did not further ACMI's business.

[11] Physical contact that results in emotional distress cannot be the subject of an intentional infliction of emotional distress claim because it is barred by the exclusivity provision of the workers compensation act. See Driscoll v. General Nutrition Corp., 252 Conn. 215 (2000) (Sexual assault was a "physical injury" within meaning of Act, such that any claim for resulting emotional injuries was governed by the Act); Bilsky v. Ansonia Copper & Brass, Case No. 4703 CRB-5-03-8, 2004 WL 2109111 (Conn.Work.Comp.Com. August 23, 2004) ("the physical component of an assault need not damage the body severely enough to necessitate medical treatment for physical trauma in order to constitute a personal injury within the meaning of the Act.")

procedures for resolving disputes between her and her employer. (Statement, ¶ 5.) She also admits that she never filed a grievance. (Statement ¶ 68.)

The plaintiff cites cases that she argues hold that there is no requirement that intentional infliction of emotional distress claims be grieved. However, all of these cases are easily distinguishable. In fact, as set forth below, the Connecticut Appellate Court has just specifically held that failure to exhaust a grievance procedure can preclude a claim for negligent infliction of emotional distress. Sobczak v. Board of Educ. of City of Meriden, 88 Conn.App. 99, 2005 WL 549228, *4-*5 (Conn.App.,2005). Four of the cases cited by plaintiff (Bak, Lingle, Vorvis and Claps) are interpreting preemption under the Labor Management Relations Act (LMRA). Section 301 of the LMRA preempts state tort law actions by an employee against an employer alleging breach of a collective bargaining agreement. ACMI makes no claim that the LMRA preempts the plaintiff's emotional distress claim, or that the plaintiff is alleging a breach of the CBA. As such, the analysis in these cases is inapplicable.

The other case cited by plaintiff, Mendillo v. Board of Educ. of Town of East Haddam, 246 Conn. 456 (Conn.1998) is also distinguishable, and the text of the court's opinion actually supports ACMI's argument that the plaintiff was required to exhaust grievance procedures. In Mendillo, the term "grievance" was defined in the collective bargaining agreement as "a complaint by an administrator or a group of administrators that there has been a violation, misinterpretation or misapplication of a specific provision or provisions of this contract to the detriment of the administrator or administrators concerned." Id. at 476. There, the court concluded that the plaintiff's claim that the defendant intentionally caused her emotional distress did not fall within that definition and there was no exhaustion required. Id. at 476-77. The court stated: "[w]hether a dispute is grievable under a collective bargaining agreement depends on the proper interpretation of the agreement...grievance procedures must be exhausted if the underlying contract embraces the disputed matter." (Citations omitted, internal quotation marks omitted) Id. at 476. However, here, the plaintiff does not dispute that ACMI's provision permits grievances regarding: "differences or disputes…between the Employer and any employee affected by this Agreement…." (Statement, ¶ 5.) This broadly worded clause contemplates any disputes between the plaintiff and ACMI, which would, of course, include claims for intentional infliction of emotional distress. Therefore, under Mendillo, the plaintiff was required to exhaust the grievance procedures.

In fact, the Connecticut Appellate Court just distinguished a case from Mendillo in this exact same manner in March 2005.  In Sobczak, the court reviewed the plaintiff's claim that his failure to exhaust grievance procedures did not prevent him from bringing a negligent infliction of emotional distress claim.  He argued that the holding in Mendillo supported this contention.  However, the Sobczak court held that "whether a dispute is grievable under a collective bargaining agreement depends on the proper interpretation of the agreement," and it was only because the "alleged tortuous conduct did not fall within the definition of grievance as provided in the collective bargaining agreement [that] the court in Mendillo held the plaintiff's claim was not subject to the agreement's grievance procedures."  Id. at *4.  In Sobczak, unlike in Mendillo, the grievance procedure at issue was broadly worded like the one here.  (See Statement ¶ 5.)  Thus, the emotional distress claim fell under that provision, and the failure to file a grievance was held to be fatal to that claim.

The plaintiff also argues that it would have been futile to file a grievance because she left ACMI in December 2001 after she was mistreated, and was no longer an employee in the period when filing a grievance would have been appropriate.  However, she has admitted that she in fact remained an employee after she physically left ACMI.  (Statement, ¶ 60.)  Further, this argument does not apply to her failure to file a grievance regarding her pre-December 2001 treatment.  Therefore, even if a grievance would have been futile after she left, she can only base her intentional infliction claim on conduct occurring in December 2001, which is, *a fortiori*, insufficient to sustain her claim.  Notably, the plaintiff has not cited any evidence that pursuing a grievance would have been futile while at ACMI, apart form her conclusory testimony that "nothing gets done…and it's like a joke."  (Statement ¶ 68.)  This "mere…lack of trust on the employee's part is not sufficient evidence of futility."  Peters v. National Wholesale Liquidators of Orange, Inc., 2002 WL 467761, *4, 31 Conn. L. Rptr. 455, (Conn.Super. 2002).  The Sobczak court also addressed a futility argument in its recent decision, and rejected that argument, stating: "plaintiff's contention that it necessarily would be unavailing to file a grievance…is purely speculative. 'The mere possibility, or even likelihood, of an adverse decision does not render a remedy futile.'"  Sobczak at *3, quoting Neiman v. Yale Univ., 270 Conn. 244, 260 (2004).  Accordingly, the plaintiff's failure to file a grieve her treatment precludes her emotional distress claim.

## X.     Conclusion

For the foregoing reasons, ACMI's Motion for Summary Judgment should be granted.

THE DEFENDANT:
ACMI CORPORATION


By_____
    James M. Sconzo
    Fed Bar # ct04571 and
    Jonathan C. Sterling
    Fed Bar # ct24576 of
    HALLORAN & SAGE LLP
    One Goodwin Square
    225 Asylum Street
    Hartford, CT 06103
    (860) 522-6103


## **CERTIFICATION**

This is to certify that on this 18th day of March, 2005, I hereby mailed a copy of the foregoing to:

Kathryn Emmett, Esq.
Christine Caulfield, Esq.
Emmett & Glander
45 Franklin Street
Stamford, CT  06901


_____
James M. Sconzo

665247